FILED
2023 Sep-15  PM 12:10
U.S. DISTRICT COURT
N.D. OF ALABAMA



AlaFile E-Notice

47-CV-2023-900210.00

To:   THOMAS E. BAZEMORE III
      tbazemore@huielaw.com

---

# NOTICE OF ELECTRONIC FILING

---

IN THE CIRCUIT COURT OF MADISON COUNTY, ALABAMA

DYNAMIC CAMPUS SOLUTIONS, INC. V. OAKWOOD UNIVERSITY, INC.
47-CV-2023-900210.00

The following complaint was FILED on 6/13/2023 3:11:09 PM

Notice Date:      6/13/2023 3:11:09 PM

DEBRA KIZER
CIRCUIT COURT CLERK
MADISON COUNTY, ALABAMA
MADISON COUNTY, ALABAMA
100 NORTHSIDE SQUARE
HUNTSVILLE, AL, 35801

256-532-3390

ELECTRONICALLY FILED
6/13/2023 3:11 PM
47-CV-2023-900210.00
CIRCUIT COURT OF
MADISON COUNTY, ALABAMA
DEBRA KIZER, CLERK

## IN THE CIRCUIT COURT OF MADISON COUNTY, ALABAMA

| | | |
|---|---|---|
| DYNAMIC CAMPUS SOLUTIONS, INC., | } | |
| | } | |
| | } | Case No.: 47-CV-2023-900210 |
| Plaintiff, | } | |
| | } | **JURY TRIAL DEMANDED** |
| vs. | } | |
| | } | |
| OAKWOOD UNIVERSITY, INC., | } | |
| | } | |
| Defendant. | } | |

## SECOND AMENDED VERIFIED COMPLAINT

COMES NOW Plaintiff Dynamic Campus Solutions, Inc. ("**Dynamic Campus**" or "**DCS**"), and files this suit against Defendant Oakwood University ("**Oakwood**") and seeks the entry of a permanent injunction and states as follows:

## THE PARTIES

1.      Plaintiff Dynamic Campus is a corporation that is organized under the laws of the State of California, with a principal place of business located at 2806 Flintrock Trace A205, Austin, TX 78738.

2.      Defendant Oakwood is an institution of higher education whose business address is, and may be served at, 7000 Adventist Blvd. NW, Huntsville, AL 35896. Oakwood has been served and appeared herein.

## JURISDICTION AND VENUE

3.      This Court has jurisdiction over the parties to this action and over the subject matter of this action.

4.      This Court has personal jurisdiction over the Defendant because Defendant requested that Plaintiff provide information technology services for it within the State of

1

Alabama. Additionally, the parties signed a written Confidential Mediated Settlement Agreement ("**Settlement Agreement**" a redacted portion which is attached hereto as **Exhibit "A"**) that contains a Governing Law and Dispute Resolution provision whereby Defendant consented to this court's jurisdiction as to any litigation between the parties arising out of or related to the Settlement Agreement.

5.     Venue is proper in this court pursuant to Alabama Code 6-3-7 because a substantial part of the events or omissions giving rise to this claim occurred in Madison County. Furthermore, the parties' Settlement Agreement contains a Governing Law and Dispute Resolution provision which mandates that venue lies in a state circuit court for Madison County, Alabama located in Huntsville, Alabama.

## CONDITIONS PRECEDENT

6.     All conditions precedent have been performed or have occurred as required by the applicable sections of the Settlement Agreement between Dynamic Campus and Oakwood.

## INTRODUCTION

7.     This lawsuit arises out of Defendant's breach of the parties' recent Settlement Agreement. Plaintiff recently sued Defendant for breach of contract because of its failure to pay substantial amounts past due and owing for IT services provided by Plaintiff to Defendant. Defendant claimed that its failure to pay was justified because Plaintiff had failed to provide adequate electronic data backup and restoration services pursuant to the parties' IT Services Agreement (the "**Service Agreement**" attached hereto as **Exhibit "B"**).

8.     Dynamic Campus is a privately owned IT outsourcing service provider. For 20 years, Dynamic Campus has provided IT outsourcing services to smaller, private colleges and universities with the technical and functional expertise and scalability of a large, public

2

university—but for a flat, monthly fee that's right for smaller institutions, such as the Defendant. Since 2002, more than 350 four-and two-year colleges and universities have relied on Dynamic Campus's unique combination of trusted tactical, functional, and strategic technology expertise to ensure their institutions always have the IT and consulting horsepower they need. It is a relatively small industry in which many of Dynamic Campus's customers and prospective customers know one another and frequently meet, talk and "trade notes" at various higher education seminars and meetings. Dynamic Campus's competitors are also very well known to each other.

9.      Oakwood is a private, historically black Seventh-day Adventist university in Huntsville, Alabama. Oakwood is accredited by the Southern Association of Colleges and Schools (SACS) and the Department of Education of the General Conference of Seventh-day Adventists (through the Adventist Accrediting Association) to award associate, baccalaureate, and master's degrees.

10.     Oakwood is the very type of university to which Dynamic Campus provides IT outsourcing services. In fact, Dynamic Campus provides the same or similar services to other Seventh-day Adventist universities, all relatively small community religious higher education institutions.

11.     On January 17, 2023, Dynamic Campus and Oakwood entered into a confidential settlement agreement, which contained, amongst other things, a confidentiality provision and a non-disparagement provision.

12.     With the ink barely dry on the Settlement Agreement, Oakwood intentionally and blatantly defamed Dynamic Campus and violated the confidentiality and non-disparagement provisions in the Settlement Agreement.

13.     Specifically, on February 9, 2023, less than one month after the Settlement

3

Agreement was executed, Oakwood hosted a **Town Hall meeting** in which its Chief Technology Officer, Carlin Alford, defamed Dynamic Campus, and in so doing, blatantly and egregiously breached the confidentiality and non-disparagement provisions of the Settlement Agreement.

14.    To make matters worse, Oakwood uploaded its **Town Hall meeting** to the internet on February 14, 2023, via YouTube for the world to see, including customers, prospective customers and Dynamic Campus's competitors.

15.    Accordingly, Dynamic Campus brings this lawsuit against Oakwood for **breach of contract, defamation per se and unlawful business disparagement**.[1] And, by way of separate pleadings, filed concurrently herewith, Dynamic Campus seeks a temporary restraining order and preliminary injunction in order to attempt **to stop the irreparable harm to its business and reputation for which there is no adequate remedy at law**. In short, Dynamic Campus seeks expedited relief to enforce Oakwood to comply with its contractual obligations and to limit the irreparable harm being caused by Oakwood's unlawful publication of confidential, disparaging and defamatory statements.

## **FACTUAL BACKGROUND**

16.    On January 17, 2023, Dynamic Campus and Oakwood executed the Settlement Agreement arising out of a lawsuit filed by Dynamic Campus for breach of contract based upon its provision of IT services and support and Oakwood's ongoing failure to pay for same. When the dispute started, a substantial amount of money was past due and owing to Dynamic Campus. Oakwood claimed that it was justified in not paying, alleging Dynamic Campus's failure to provide adequate data backup and restoration services under the parties' Service Agreement of

---

[1] The substantive law of the Settlement Agreement is governed by Texas law.

4

May 1, 2019, resulting in Oakwood incurring financial loss when it was the victim of a ransomware cyber-attack by an unknown cyber-criminal in early 2022.

### A. THE RANSOMWARE INCIDENT & SUBSEQUENT RECOVERY EFFORTS

17.     In March of 2022, Oakwood University was the victim of a cyber-attack committed by an unknown criminal. The third-party, unknown criminal infiltrated the Oakwood network and was able to compromise an elevated account assigned to DCS's system administrator. It's important to note that the parties' Service Agreement does NOT include IT support directly associated with security breaches and ransomware.[2]

18.     The threat actor (a/k/a the unknown third-party criminal) was initially blocked by Carbon Black, an antivirus/antimalware system that DCS had in place but was able to work around Carbon Black to gain administrative access. With full administrative privileges, the criminal spent a few days looking for personal/ private information ("**PII**") and systems to encrypt. After sending the PII to an external site, the criminal planted malware on a variety of machines to invoke at a future time. As a final step, on March 13, 2022, the criminal encrypted most running VMware[3] servers and then the VMware infrastructure itself.

19.     The first indication of a problem was when internet access at Oakwood went down. The DCS Shared Services team quickly traced the problem to the Dell storage device [VNX and ExtremIO]. Dell support was contacted and in the course of trying to fix what Dell believed was a broken machine, Dell damaged the ExtremIO beyond repair, thereby locking out DCS's ability to

---

[2] Schedule A Statement of Work to the Parties' Agreement outlines DCS's responsibilities and absent from this detailed list is any mention of the provision of support directly associated with security breaches and/or ransomware.
[3] **VMware** are "virtualized" computers. A virtual server is created out of software on a large physical computer. **VMware** allows you to create many servers out of software on a single large computer. Since the whole server is just software (containing the "virtualized" operating system, memory, files, etc.), it can be encrypted twice - once when the virtual server is running as a computer, and then again when the file of the encrypted virtualized server is encrypted.

recover the most current database of their key software, Jenzabar. During this time, Shared Services' techs reinstalled the VMware environment and were able to view the files. It was at that time the techs saw indications of the presence of ransomware infecting the environment.

20.     Over the next six weeks, DCS worked closely with Kroll, a corporate investigation and risk consulting firm brought in by Oakwood, to investigate the criminal cyber-attack and resulting Ransomware Incident. Based upon the daily interactions and discussions between Kroll and DCS, DCS understands that Kroll's investigation is exculpatory evidence favorable to DCS and essentially vindicates DCS of any liability related to the Incident and in simple terms, confirms that DCS was NOT at fault. In early May 2022, DCS learned that Kroll was asked by Oakwood not to prepare a formal forensic report, as inconceivable as it may seem.

21.     While multiple requests were made to Oakwood to produce Kroll's written report and/or analysis of the ransom attack, nothing was ever provided. Assuming Oakwood and its counsel take the position that the Kroll investigation is privileged, this is a meritless posture based on DCS's interaction with Kroll throughout the investigation and oral statements from Kroll representatives to DCS representatives very complimentary of DCS's work product and efforts to limit the damage to Oakwood and restore Oakwood's IT infrastructure. DCS's counsel has placed Oakwood on notice of its duty to preserve this information and if the requested information is not turned over, DCS intends to seek a spoliation finding and other available remedies.

22.     Several months after the criminal cyber-attack and Ransomware Incident, and after Kroll completed its investigation, and weeks after DCS notified Oakwood that it was in default of its payment obligations under the parties' Service Agreement, Oakwood sent a concocted laundry list of claimed failures on the part of DCS to fulfill its obligations under the Service Agreement and a follow up letter to same. Both letters were unexpected given the praises that Sabrina Cotton

(Oakwood's VP of Financial Administration) had previously extended to DCS and its staff for their efforts during the investigation and recovery following the criminal attack. DCS diligently responded to the claims in a timely fashion and provided Oakwood documentary evidence to demonstrate that DCS complied with industry standards in the provision of information technology services.

23.    As to each non-meritorious claim of failure raised by Oakwood's letters[4], DCS was able to refute these claims, including, without limitation the following:

24.    <u>Maintain regular backups of Oakwood's servers</u> – Oakwood claims DCS failed to "refresh, restore, and backup services for optimal service," and that the last working backup dated back to 2019. **This is false**. Backups are a core part of the IT business and while it is not a common practice to document same, backups were maintained regularly and kept on a storage device. The actual dates of backup are embedded in the filename and evidence regular backups. Also, the backups were regularly tested. On numerous occasions prior to the criminal attack, backups were used to restore files and systems, and to provide a refresh to test pre-production environments. In a nutshell, the backups worked.

25.    Throughout April 2022, DCS worked diligently to restore the backup of files. DCS was unable to access the backups following the Incident as DCS did not have access to the configuration keys. Oakwood's system was configured and installed prior to DCS's involvement as the IT Service provider. Oakwood was solely responsible to record the keys and pass them onto DCS, in order to provide DCS the right to access the configuration keys. Oakwood failed in its contractual obligation to provide same, which caused DCS's inability to access the backups following the criminal Ransomware Incident.

---

[4] The October 30, 2022, letter from Dr. Pollard is a follow up to Ms. Cotton's September 2, 2022, letter and readdresses the same claims. DCS addresses and refutes all of these claims.

26.    Additionally, DCS has learned that CSPIRE, the vendor that configured the VEEAM backup solution for Oakwood prior to DCS becoming the IT service provider, had also not recorded the configuration keys. DCS cannot be blamed for any alleged loss, damage, or destruction or inability of Oakwood to use any service, system or program as there was nothing DCS did or failed to do that amounted to negligent conduct. More importantly, the Parties' Service Agreement clearly outlines the circumstance in which liability shall be imposed upon DCS requiring it to take commercially reasonable steps to restore data, service, system and program.[5] Notably, that circumstance was not present here.

27.    This unique situation created an unworkable problem and was caused by an unknown criminal encrypting the backup system AND neither the system's vendor, CSPIRE, nor Oakwood had the original configuration information which was necessary under this unique situation. DCS shares no blame or negligence for actions or failures to act under circumstances under which it had no control.

28.    <u>Adequately perform its disaster recovery responsibilities</u> – Oakwood cited to Section 5.1 of the parties' Service Agreement in support of its claim that "In the event of loss, damage, or destruction of data, or the inability of Oakwood to use its systems, DCS was obligated to take "commercially reasonable steps to restore data, services, systems or programs within a commercially reasonable period of time." This claim is false and also misleading. Oakwood notably omits the most significant language from Section 5.1 of the Parties' Service Agreement:

> In the event of loss, damage, or destruction of any date[sic], or the inability of Oakwood to use any service, system or program ***due to***

---

[5] Section 5.1 of the Parties' Service Agreement sates that, "In the event of loss, damage, or destruction of any date[sic], or the inability of OU to use any service, system, or program due to the ***sole negligence of Dynamic Campus***, Dynamic Campus shall take commercially reasonable steps to restore such data, service, system or program within a commercially reasonable period of time. The failure of Dynamic Campus to restore such data, service, system or program within a commercially reasonable time shall be deemed a material breach of this Agreement." **<u>Exhibit "B"</u>** at Section 5.1 (emphasis added).

***the sole negligence of Dynamic Campus***, Dynamic Campus shall take commercially reasonable steps to restore such data, service, system or program within a reasonable period of time. The failure of Dynamic Campus to restore such data, service, system or program within a commercially reasonable time shall be deemed a material breach of this Agreement.

**Exhibit "B"** at Section 5.1 (emphasis added).

29.     DCS complied with industry standards in addressing the criminal ransomware attack. When the backup system is not encrypted, the configuration keys are not needed to restore data from Amazon Web Services ("**AWS**"). The Ransomware Incident at Oakwood was a unique situation where the VEEAM server itself (with its configuration data) was encrypted and DCS could not recreate a new VEEAM environment with access to the backups on AWS without the key information for AWS that was created by CSPIRE during installation.

30.     Oakwood's claim that DCS did not perform its disaster recovery responsibilities has absolutely no merit as DCS responded immediately, dedicated countless hours, and played a vital role in recovery efforts with the information and access it had available at the time. Oakwood IT and DCS teams met daily, while attorneys for Oakwood, Kroll, Oakwood IT and Oakwood met three times a week. Kroll's investigation vindicated DCS's involvement and recovery efforts and Oakwood likewise applauded DCS's recovery efforts. DCS's inability to access the configuration keys was due to no negligence on DCS's part and, in fact, was due to Oakwood's failure to comply with its contractual obligation. In fact, DCS went well beyond the scope of work laid out in the parties' Service Agreement, at no additional cost to Oakwood, to help Oakwood recover from the Ransomware Incident. This entailed DCS providing out of contract services and additional hours at no extra charge.

31.     <u>Ransom payment</u> – Oakwood claims that as a result of DCS's failure to perform its

obligations under the Agreement, Oakwood was forced to pay the unknown criminal's ransom. This claim is meritless. There is nothing in the parties' Service Agreement that says DCS's services includes or warrants the prevention of cyber-attacks. DCS complied with community standards in providing IT services and in implementing commercially reasonable steps to combat the attack. And, as explained above, DCS provided regular backup for Oakwood's systems and data.

32.     As noted above, Oakwood's system was configured and installed by CSPIRE prior to DCS taking over IT services per the Agreement. The configuration keys needed to access the backups on AWS were not recorded by CSPIRE and, if Oakwood had recorded the keys prior to the parties' Service Agreement, Oakwood did not pass the keys to DCS as required under Section 4.5 of the parties' Service Agreement.

33.     Insurance premiums – Oakwood is attempting to pin blame on DCS for the criminal cyber-attack and the ransom paid or the manner in which recovery efforts were implemented. However, as explained throughout, there was nothing that DCS did or failed to do that caused or contributed to the Ransomware Incident or to the alleged fallout from the Ransomware Incident.

34.     The above illustrates at least in substantial part, there is nothing that DCS did or failed to do that caused any claimed damages to Oakwood and that DCS was not responsible in whole or in part for the criminal acts of a third party and Oakwood's decision to pay a ransom to retrieve its data and per Kroll, more significantly to avoid having the criminal disseminate the stolen PII to the public over the internet, akin to a WikiLeaks.

35.     DCS neither advised Oakwood about nor was involved in communications between Oakwood and the criminal. Further, DCS was not involved in the decision to pay the ransom. Rather, Oakwood failed to comply with *its* contractual obligations by failing to obtain and transfer rights to DCS to utilize the configuration information that was needed during recovery efforts.

Oakwood's claims of professional negligence and/or breach of contract against DCS are spurious attempts to deflect attention from Oakwood's own negligent conduct and the negative impact of the criminal cyber-attack.

### B. THE SETTLEMENT AGREEMENT

36.    The Settlement Agreement contains a confidentiality agreement and a broad non-disparagement clause, both of which were breached by Oakwood before the ink was barely dry on the Settlement Agreement.

37.    As will become apparent, Oakwood's excuses are the basis of actionable statements by it concerning Dynamic Campus having "left the refrigerator locked and unplugged, so that Oakwood could not get its cheesecake" which had already been paid for. And, when the refrigerator was finally opened "the cheesecake being spoiled," because Dynamic Campus had left the refrigerator unplugged despite being paid not to. And then, the "IT Company [Dynamic Campus]" leaving Oakwood in the dead of night without notice, resulting in a state of chaos from which Oakwood had to be rescued by Dynamic Campus's chief competitor, Ellucian.

38.    The relevance of the "locked and unplugged refrigerator," the "spoiled cheesecake" and being abandoned by its "IT Company [Dynamic Campus]" and left in a state of chaos will quickly become apparent as one reads this Complaint and the rationale for Dynamic Campus's request for a restraining order and injunctive relief. In short, Oakwood's statements violate the parties' confidentiality agreement, non-disparagement agreement and are defamatory per se; any one of which demonstrate the merits of this claim and support the granting of injunctive relief.

39.    Section 4 of the Settlement Agreement contains confidentiality and non-disparagement provisions. *See* **Exhibit "A"** at Sections 4(a) & (b) of the Settlement Agreement. The confidentiality provision states that:

> all matters and communications *relating to*[6] the Parties' negotiation and terms of [the Settlement Agreement], the Lawsuit and the Claims… shall be confidential and are not to be disclosed *except as may be required* by a subpoena, or in discovery or testimony in litigation related to the Ransomware Incident, any other rules or procedures of a court of law, order of a court of competent jurisdiction, or an agreement in writing by the Parties.

*Id.* at Section 4(a) (emphasis added). None of the exceptions to confidentiality apply in this case.

40.    The Parties further agreed that "the covenant of confidentiality contained in this Agreement *is material* and mutually and equally beneficial to the Parties." *See* **Exhibit "A"** at Section 4(a) of the Settlement Agreement. Nevertheless, Oakwood violated the confidentiality agreement in early February, just weeks after the Settlement Agreement was signed.

41.    The violation occurred at an Oakwood Town Hall meeting on or about February 9, 2023, which Oakwood uploaded to social media on or about February 14, 2023, for the whole world to see. *See* https://youtu.be/LBvywtzLwhA, minutes 15:55–23:50; 26:55–31:40; 33:05–33:27; 39:09–40:45; 41:30–41:45; and 50:55–51:30 and a redacted copy of the Town Hall transcript, p.s. 12–18; 20–25; 29–31; and 38–39. (the "**Transcript**" a redacted version of which is attached hereto as **Exhibit "C"**).

42.    The Settlement Agreement also provides that: "**the Parties agree not to disparage each other.**" *See* **Exhibit "A"** at Section 4(b) of the Settlement Agreement. The parties further agreed:

> that if either is asked about the Claims, as defined above, that Party shall simply state that all matters between the Parties have been resolved to their mutual satisfaction or similar words to that effect, unless otherwise compelled by legal process. Moreover, *the Parties agree and covenant that they shall not, at any time, make, publish, or communicate* to any person or entity or *in any forum* (including but not limited to, through *internet websites, social media*, print, television, radio, or any other communication format or platform)

---

[6] Under Texas law, the phrase "relating to" is to be construed as broadly as reasonably possible.

> any complaints, criticisms, disparaging, malicious or negative remarks, comments, or statements concerning the other or its business, or any of its employees, officers, or directors now or in the future.

*Id.* at Section 4(b) (emphasis added).

43.     Further, Oakwood's statements at issue here are materially and verifiably false. Such statements not only directly concern Dynamic Campus, the services it provides, and its ability to provide those services but also significantly undermines Dynamic Campus's reputation in its relatively small industry and community of current and potential clients. Specifically, while Dynamic Campus was not mentioned by name, the dispute between Oakwood and Dynamic Campus and the Ransomware Incident was generally known to other Dynamic Campus customers, prospective customers and its competitors, significantly its chief competitor, Ellucian.

44.     As such, each disparaging and defamatory statement at issue was made in specific and quantifiable terms such that it was clear and obvious to the members of the audience, and those watching on YouTube, that each statement was made about Dynamic Campus, the services it provides, and its ability to provide these services. This is especially true given that Oakwood is a 7th day Adventist college, which is a particularly small national community of religious higher education institutions, and Dynamic Campus services other 7th day Adventist colleges with whom Oakwood is in regular contact.

### C. SUMMARY OF FALSE & DISPARAGING STATEMENTS BY OAKWOOD AT ITS TOWN HALL ARISING OUT OF THE RANSOMWARE INCIDENT & SUBSEQUENT RECOVERY EFFORTS

45.     As noted above, on February 9, 2023, less than one month after the Settlement Agreement was executed, Oakwood hosted a ***Town Hall meeting*** in which its Chief Technology Officer, Carlin Alford, defamed Dynamic Campus, and in so doing, blatantly and egregiously

breached the confidentiality and non-disparagement provisions of the Settlement Agreement.

46.     To make matters worse, Oakwood invited Ellucian, DCS's chief competitor, to the Town Hall meeting; and thereafter, uploaded the ***Town Hall meeting*** to the internet on February 14, 2023, via YouTube for the world to see, including customers, prospective customers and competitors of Dynamic Campus.

47.     Moreover, Alford, who spoke like quite the authority on the Ransomware Incident when casting aspersions on DCS was not employed by or present at Oakwood at the time of the Ransomware Incident or during the recovery efforts. In fact, Alford did not even join Oakwood until after DCS had ceased its relationship with Oakwood due to Oakwood's failure to pay substantial amounts of money past due and owing, as well as Transition fees.

48.     Alford joined Oakwood days after DCS's departure from Oakwood. As such, he was employed by Oakwood as its Chief Technology Officer ("**CTO**") when the underlying lawsuit between the parties was mediated in December 2022 and most importantly, when the Settlement Agreement was entered into in mid-January 2023; thus, so he either was well aware of Oakwood's confidentiality obligations and non-disparagement obligations or should have been, especially given his actionable diatribe against DCS (the "Old Company") at the February 2023 Town Hall meeting.

49.     The following is a summary of just some of the false statements made by Oakwood at the Town Hall meeting giving rise to not only DCS's breach of contract claim, but its defamation per se claim, as well.

50.     During the Town Hall, Oakwood's CTO, analogized Oakwood to a "house" to inaccurately describe the Ransomware Incident and actions taken thereafter to recover and preserve Oakwood data. Specifically, Alford said "think of Oakwood as a house."

51.    In so doing, Alford claimed that Oakwood's IT data "the cheesecake" in the "refrigerator" in the house was "spoiled" due to DCS failing to properly back it up and preserve it – the IT data – the cheesecake in the refrigerator.

52.    He blamed DCS for the "refrigerator being unplugged" and claims that DCS was at fault for the "spoiled" cheesecake. Specifically, he said "those who were responsible for keeping the cheesecake refrigerated [DCS] either forgot or didn't plug the refrigerator in." This is absolutely FALSE.

53.    Rather, DCS ensured that data backups were occurring as scheduled and CSPIRE, the backup vendor that Oakwood hired prior to Dynamic Campus arriving, had data supporting that backups continued until the servers were encrypted. That means that up-to-date data backups existed. In short, Oakwood's claim that DCS failed to adequately back up data is false and defamatory – and was also Oakwood's purported justification for not paying DCS.

54.    Further, Alford stated that "nobody [DCS] could tell us why the refrigerator was unplugged (*i.e.,* why was Oakwood's data so compromised)." This is absolutely FALSE. The data was compromised because the criminal encrypted all the data multiple times – at the operating system level, as well as at the server level. DCS communicated this to Oakwood as Oakwood is well aware, yet another false and defamatory statement painting DCS as incompetent.

55.    Alford claimed that "those [DCS] who were hired to do a job who didn't quite do it." This is FALSE. DCS complied with all of its contractual obligations under the parties' Service Agreement. The cyber-attack was not the result of DCS "failing to do its job," nor were the data recovery issues encountered or Oakwood's decision to pay the ransom. Alford never mentioned the Dell equipment failure, other Oakwood vendor issues or Oakwood's prior disregard of DCS's advice to upgrade various IT equipment. Yet, another defamatory statement.

56.     Alford blamed the "Old Company" (DCS) for leaving Oakwood in a lurch after it left in a variety of ways, including, without limitation, the following. Alford criticized DCS for not "leav[ing] a map" reflecting where Oakwood's hundreds of WiFi access points were located. This is materially misleading, casting DCS yet again in a negative light and thus, another defamatory statement. What Alford didn't say or address is that the company who designed and installed the WiFi did not provide Oakwood with "a map." DCS was engaged by Oakwood after the WiFi access points were installed – something Alford conveniently failed to mention casting DCS in a FALSE and negative light. Alford also conveniently failed to mention that after DCS was retained by Oakwood, DCS worked with the WiFi company to obtain the "map" or a "map" and other relevant information. The WiFi company claimed to have very little information and provided little response of value. Alford's accusation is akin to asking DCS for the blueprints to a building that it didn't build.

57.     Alford also claimed that DCS left Oakwood without leaving it the password to or ability to access the IT ticketing system. This is FALSE. Rather, on December 7, 2022, DCS's last day at Oakwood (due to Oakwood's repeated failure to pay monies due and owing under the Parties' Service Agreement), DCS met with Oakwood and specifically, Oakwood executive, Sabrina Cotton, and provided her the keys to the password vault that held the passwords to the ticketing system and many other systems across campus and in the cloud.

58.     Alford also strongly implied that Oakwood had fired DCS, analogizing to the breakup of a "dating…relationship." Alford stated:

> …you in the relationship there's always this moment all right let's be real I'm sorry but I don't think this is gonna work out oh that's good because I was gonna quit anyway okay goodbye no no no you didn't dump me I walked away no no no no no no you didn't walk away I let you go right that's what happened right and unfortunately the relationship ended before the responsibilities were doled out to

another company so when you left your ID cards were working key fobs were working you could get in and see your classes most of you had pre-registered and financially cleared right all of that stuff was working but when that when when the company left we found out I said we I wasn't here but when we finally we found we found out a lot of that stuff was not automated it was a person or a people typing this in here and then sending the data here and when you do that and it's not connected with a link or automation there's room for error but bigger than that what happens if that person gets sick what person has that person what happens that person leaves in the middle of the night with the other other the the other part of the company and says we're done the entire campus would be crippled that's what happened so when you got back everything that did work most of it wasn't working that's because there was no other the the company that replaced the company behind ouit contractually wasn't even under contract until late December at the last minute I think we were like New Year's Eve or we were still working off contract and on January 3rd illusion [Ellucian] showed up they literally flew people in I'm talking like this is the kind of stuff the GE stuff again like Mission Impossible stuff like they were flying in Specialists from all over because I'm not exaggerating those the two people from Volusia [Ellucian] are here San Diego right California he flies in on Monday and flies out on Fridays usually flies on Thursday night so he's here because we asked him to be here he's usually on a plane to go back so he can get back on Monday and uh Oklahoma he drives nine hours to get here folks this is what has been done in order to shore up and to restore repair and replace all of the length and the problems that that we had with the exit of The Old Company [DCS] talking again about why we're here all right I know I've talked a lot but this is the biggest part of understanding because when you're frustrated with why things are now you know why Bad actors environment bad relationship with a company that ended and on top all of that we got a bunch of old stuff…

59.    The above "spin of a yarn" is materially false or so materially misleading as to cast DCS in a negative, false and damaging light so as to be defamatory.

60.    Moreover, during the Town Hall, Alford strongly implied that because of Oakwood's "bad relationship with Dynamic Campus it was left with a bunch of poor and defective

equipment and systems – "Bad actors environment **bad relationship with a company that ended and on top all of that we got a bunch of old stuff so that is where we started**…"

61.     Again, this is categorically false and misleading. To the extent Oakwood was left with "a bunch of old stuff," this is because Oakwood chose not to follow recommendations by Dynamic Campus to upgrade its technology equipment, specifically, some of the key higher education technology.

62.     Also, some of the equipment and systems Alford was critical of and directing blame towards Dynamic Campus for was simply false and outright erroneous. For instance, Alford was critical of Dynamic Campus's use and set up of the Jenzabar system. However, the Jenzabar system and how Dynamic Campus utilized it at Oakwood is one of the most prominent Enterprise Resource Planning tools in Higher Education and it is designed to contain all core data. Again, yet another false statement by Oakwood designed to portray Dynamic Campus in a negative and false light and to injure its business reputation.

63.     Further, Alford claimed that after Dynamic Campus moved Jenzabar to the cloud, that Oakwood's data stored in the cloud did not sync with data on campus— "the problem we went to the cloud it didn't sync up with the data on campus." This is absolutely FALSE. After moving Jenzabar to the cloud, Dynamic Campus rebuilt data integrations to other systems so that the data flowed properly. All data integration were completed before Dynamic Campus's relationship with Oakwood ended.

64.     While portraying Dynamic Campus in a negative and false light as it concerned the cyber-attack, Ransomware Incident and subsequent recovery efforts, Oakwood conveniently failed to mention that Kroll reported to Dynamic Campus that the criminals got into the Oakwood IT system through Oakwood HR personnel or a student or Oakwood employee terminal in Oakwood's

library. Dynamic Campus certainly did not let the criminal in and, despite what Alford said, the criminal actor was not inside the Oakwood IT system for years waiting to attack, all the while undetected by Dynamic Campus. That is simply false. Moreover, the criminals did not call Oakwood demanding a ransom as Alford stated, rather they were caught by Dynamic Campus while it worked with Dell to recover data from a failed Dell storage device.

## CAUSES OF ACTION

### Breach Of Contract

65.    Dynamic Campus hereby incorporates by reference as though fully set forth herein each of the allegations and facts contained in paragraphs above.

66.    Operating under the guise of supposed transparency at the Town Hall, Oakwood blatantly and repeatedly violated its confidentiality and non-disparagement obligations under the parties' Settlement Agreement.

67.    Oakwood breached the parties' confidentiality agreements on or about February 9, 2023, during an Oakwood Town Hall and then published its actionable statements on or about February 14, 2023, when it uploaded the Town Hall meeting to the internet via YouTube. *See* https://youtu.be/LBvywtzLwhA, 15:55–23:50; 26:55–31:40; 33:05–33:27; 39:09–40:45; 41:30–41:45; and 50:55–51:30 and the Transcript p.s. 12–18; 20–25; 29–31; and 38–39.

68.    Oakwood has also breached the non-disparagement provision by making complaints, criticisms, disparaging, malicious and/or negative remarks about Dynamic Campus in specific and quantifiable terms. It is obvious to the audience that reference is being made to Dynamic Campus, Oakwood's former IT service provider, particularly amongst 7th day Adventist higher education institutions, some of which are clients of Dynamic Campus and Dynamic Campus's competitors, in particular its single largest competitor, Ellucian.

69.    As a direct and proximate result of Oakwood's breach of contract, Dynamic

19

Campus has suffered significant reputational harm and various other damages, including loss of the benefit of its bargain, consequential damages, special damages and extraordinary, irreparable harm.

**Defamation**

70.    Dynamic Campus hereby incorporates by reference as though fully set forth herein each of the allegations and facts contained in paragraphs above.

71.    In addition to blatantly and repeatedly violating its confidentiality and non-disparagement obligations under the parties' Settlement Agreement, Oakwood made numerous false and misleading statements in such a way that they create a substantially false and defamatory impression by omitting material facts or juxtaposing facts in a misleading way. In doing so, Oakwood's CTO spoke like quite the authority on the circumstances surrounding the Ransomware Incident and the events that followed thereafter, even though he is new to the higher education industry and was not even at Oakwood at the time of the Ransomware Incident or at any time while Dynamic Campus provided service to Oakwood. In fact, Alford didn't even join Oakwood until after the Service Agreement had been terminated by Dynamic Campus due to Oakwood's repeated failure to pay.

72.    Making matters even worse, Alford spoke at the invitation and in front of Oakwood's President Dr. Leslie Pollard, who had just weeks before signed the Settlement Agreement and with Dynamic Campus's chief competitor, Ellucian, at Oakwood's side, literally. To listen to Alford, you'd have no idea he was not a prominent authority on the subject and personally aware of the many false facts of which he spoke. In fact, to the unknowing person, Alford was quite the convincing orator all the while repeatedly defaming Dynamic Campus.

73.    In short, Oakwood published several false and misleading statements of fact

concerning Dynamic Campus, the services it provided under the Service Agreement, and its ability to provide these services. Each statement was a verifiably false statement of fact or so misleading to create a substantially false and defamatory impression by omitting material facts or juxtaposing facts in a misleading way so as to constitute the tort of defamation as defined under Texas law.

74.    Among those present during the Town Hall event were at least two representatives from Ellucian, Dynamic Campus's largest competitor. Further, the Town Hall event was publicly broadcast on YouTube for all to watch, including those within Dynamic Campus's relatively small industry and community of current and potential clients, particularly amongst 7th day Adventist higher education institutions.

75.    Each defamatory statement was made in specific and quantifiable terms such that it was clear and obvious to the members of the audience, and those watching on YouTube, that each statement was made about Dynamic Campus, the services it provides, and its ability to provide these services.

76.    Persons on behalf of Oakwood asserted, about as subtly *as an anvil and hammer being used to crush an insect*, that Dynamic Campus caused or contributed to exposing Oakwood's IT system to a ransomware attack, caused or contributed to the inability to recover Oakwood's data that was compromised during the ransomware attack, and that Dynamic Campus left Oakwood "in the middle of the night," leaving it in a state of chaos. All of these statements "***relat[e] to*** the Parties' negotiation and terms of [the Settlement Agreement], the Lawsuit and the Claims" meaning "claims or causes of action for breach of contract regarding the payment of invoices by Oakwood ***or the provision of data backup and restoration services by DCS*** under the Parties' Service Agreement of May 1, 2019." *See* **Exhibit "A"** at Sections 2 & 4(a) of the Settlement Agreement.

77.    Each defamatory statement is verifiably false and directly concerns Dynamic Campus, the services it provides, and its ability to provide these services, and significantly undermines Dynamic Campus's reputation in its relatively small industry and community of current and potential clients and provides an immense amount of cannon fodder for Dynamic Campus's competitors to use against it in its relatively small marketplace – IT Service Outsource Providers catering to small, private higher education institutions.

78.    Representatives of Oakwood knew or should have known of the falsity of each defamatory statement published. Defendant's false statements directly and proximately caused injury to Dynamic Campus and have caused it damage which is not yet quantifiable, but the reputational hit to Dynamic Campus in its industry amongst customers, prospective customers and competitors is self-apparent and obvious.

79.    Further, under Texas law the tort of defamation subsumes and includes "false light" when, such as here, discrete facts, literally or substantially true, are published in such a way that they create a substantially false and defamatory impression by omitting material facts or juxtaposing facts in a misleading way. Several of Oakwood's CTO's statements fall squarely herein and as such constitute defamation.

80.    As a result of Oakwood's numerous defamatory statements, Dynamic Campus can recover for damage to its business reputation and for a loss of goodwill within its industry, even without showing a direct pecuniary loss. That certainly is the case here.

81.    Plaintiff's injury resulted from Defendant's malice, which entitles Plaintiff to exemplary damages.

**Business Disparagement**

82.    Defendant published disparaging words concerning Plaintiff's economic interest.

22

The words were false and were published with malice and without privilege. The publication has caused Plaintiff special damages—reputational damage, which will no doubt further cause pecuniary loss. Dynamic Campus hereby incorporates by reference as though fully set forth herein each of the allegations and facts contained in paragraphs above.

## REQUEST FOR PERMANENT INJUNCTIVE RELIEF

83.    Dynamic Campus hereby incorporates by reference as though fully set forth herein each of the allegations and facts contained in the above paragraphs. Dynamic Campus requests that the temporary injunctive relief to which Oakwood has already consented be made permanent in the form of this Court's order and judgment.

## ATTORNEY'S FEES

84.    As a result of Oakwood's breaches of the Settlement Agreement, Dynamic Campus is entitled to recover its reasonable and necessary attorney's fees under Texas law, which is the agreed governing law set forth in the Settlement Agreement.

## PRAYER

WHEREFORE Plaintiff Dynamic Campus Solutions, Inc. hereby requests this Court enter judgment in its favor by and against Defendant Oakwood together with all damages, along with its reasonable attorney's fees, interest, costs and expenses incurred in instituting and prosecuting this lawsuit, and any other and further relief entitled to Plaintiff as this Court deems just and proper in this lawsuit. Plaintiff Dynamic Campus further requests this Court hear Plaintiff's application for temporary restraining order *ex parte*, issue such temporary restraining order, set a hearing for Plaintiff's application for preliminary injunction, and issue such preliminary injunction.

DATED THIS June 13, 2023

Respectfully submitted,

*/s/Thomas E. Bazemore, III*
Thomas E. Bazemore, III
(BAZ001)
Joseph F. Brophy
*Attorneys for Dynamic
Campus Solutions, Inc.*

**OF COUNSEL:**
HUIE, FERNAMBUCQ, & STEWART, LLP
3291 U.S. Highway 280, Suite 200
Birmingham, AL 35243
Telephone: (205) 251-1193
TBazemore@huielaw.com

**MANAGING MEMBER:**
BROPHY & DEVANEY, PLLC
The Overlook at Barton
Creek 317 Grace Lane,
Suite 210
Austin, Texas 78746
Telephone: (512) 596-3623
Joe@bdlawpllc.com

## CERTIFICATE OF SERVICE

I hereby certify that I have served a copy of the above and foregoing pleading on all attorneys of record via the AlaFile System and/or by placing a copy of same in the United States Mail, postage paid on June 13, 2023:

David B. Block
Butler Snow LLP
200 West Side Square, Suite 100
Huntsville, Alabama 35801
Telephone: (256) 936-5610
David.Block@butlersnow.com

*Attorneys for Oakwood University, Inc.*

*/s/Thomas Bazemore, III*
Of Counsel

# EXHIBIT "A"

# IN THE CIRCUIT COURT OF MADISON COUNTY, ALABAMA

|                                        |     |                              |
|----------------------------------------|-----|------------------------------|
| **DYNAMIC CAMPUS SOLUTIONS, INC.,**    | )   |                              |
|                                        | )   |                              |
| **Plaintiff,**                         | )   | Case No. 47-CV-2022-901218.00|
|                                        | )   |                              |
| **vs.**                                | )   |                              |
|                                        | )   |                              |
| **OAKWOOD UNIVERSITY, INC.,**          | )   |                              |
|                                        | )   |                              |
| **Defendant.**                         | )   |                              |

## CONFIDENTIAL MEDIATED SETTLEMENT AGREEMENT

This Confidential Mediated Settlement Agreement (the "**Agreement**") is made between Dynamic Campus Solutions, Inc. ("**DCS**") and **Oakwood University, Inc.** ("**Oakwood**") and is effective this 16th day of January, 2023 (the "**Effective Date**").

### A. DEFINITIONS

1.    The term "Lawsuit" refers to the above styled lawsuit filed in Madison County, Alabama, Case No. **47-CV-2022--901218.00**.

2.    "**Claims**" mean claims or causes of action for breach of contract regarding the payment of invoices by Oakwood or the provision of data backup and restoration services by DCS under the Parties' Service Agreement of May 1, 2019 ("**Services Agreement**").



3.    The term "**DCS**" refers to Dynamic Campus Solutions, Inc. and its successors in interest, predecessors, subsidiaries, representatives, directors, officers, employees and assigns.

1

4.     The term "**Oakwood**" refers to Oakwood University, Inc. and its successors in interest, predecessors, subsidiaries, representatives, trustees, officers, employees and assigns.

5.     The term "**Parties**" refers to DCS and Oakwood as each has been defined above.

4.    **Confidentiality & Non-Disparagement**.

a)    All matters and communications relating to the Parties' negotiation and terms of this Agreement, the Lawsuit, and the Claims as defined in **paragraph A.2** shall be confidential and are not to be disclosed except as may be required by a subpoena, or in discovery or testimony in litigation related to the Ransomware Incident, any other rules or procedures of a court of law, order of a court of competent jurisdiction, or an agreement in writing by the Parties. The Parties agree that the covenant of confidentiality contained in this Agreement is material and mutually and equally beneficial to the Parties. In the event either Party receives a subpoena or similar legal process from any third party related to the Claims, as defined herein, each Party agrees to promptly provide the other with notice by and through their respective counsel and to reasonably cooperate therewith as permitted by applicable law. Excluded from this notice obligation is any and all testimony or discovery in separate civil litigation involving the Ransomware Incident, including, but not limited to Frances Diaz v. Oakwood University, Inc., Case No. 22-cv-1844-L-MDD, pending in the United States District Court for the Southern District of California.

b)    The Parties agree not to disparage each other. The Parties further agree that if either is asked about the Claims, as defined above, that Party shall simply state that all matters between the Parties have been resolved to their mutual satisfaction or similar words to that effect, unless otherwise compelled by legal process. Moreover, the Parties agree and covenant that they shall not, at any time, make, publish, or communicate to any person or entity or in any forum (*including but not limited to, through internet websites, social media, print, television, radio, or any other communication format or platform*) any complaints, criticisms, disparaging, malicious or negative remarks, comments, or statements concerning the other or its business, or any of its employees, officers, or directors now or in the future. Notwithstanding the foregoing, a Party shall not be in breach of this provision for any statement, of whatever nature, made in its defense in the course of a civil or criminal procedure or otherwise required to be made by Court order, governmental entity, or law or regulation, including but not limited to any statement, discovery or testimony given by or on behalf of Oakwood in connection with Frances Diaz v. Oakwood University, Inc., Case No. 22-cv-1844-L-MDD, pending in the United States District Court for the Southern District of California.



3



11.    **<u>Governing Law and Dispute Resolution</u>.**

a)    This Agreement shall be governed, interpreted, and construed in accordance with the laws of the State of Texas and any dispute and/or claims by and among the Parties arising under this Agreement shall be governed by and determined in accordance with the laws of the State of Texas, which laws shall prevail in the event of a conflict of law.

b)    Any controversy, claim, cause of action, demand, complaint, or other action, whether based on contract, tort, statute or other legal or equitable theory arising out of or related to this Agreement shall be resolved in the state circuit court for Madison County, Alabama located in Huntsville, Alabama.



16.    **Effective Date.**

This Agreement shall become effective as of the "Effective Date" set forth above provided all Parties execute this Agreement via their respective signatures below.



*[signature page follows]*

6

**OAKWOOD UNIVERSITY, INC.:**

By:
Name
Title:
Date:

**DYNAMIC CAMPUS SOLUTIONS, INC.:**

By:
Name:
Title:
Date:

# EXHIBIT "B"

# INFORMATION TECHNOLOGY SERVICES AGREEMENT

## BETWEEN

## OAKWOOD UNIVERSITY and DYNAMIC CAMPUS SOLUTIONS, INC.

THIS INFORMATION TECHNOLOGY SERVICES AGREEMENT (the "Agreement") was entered into on the first day of May 2019 (the "Effective Date") between Dynamic Campus Solutions, Inc. ("Dynamic Campus" or "DCS") a California corporation located at 2806 Flintrock Trace, Suite A205, Austin, Texas, 78738, and Oakwood University ("OU"), an Alabama institution of higher education located at 7000 Adventist Blvd NW, Huntsville, AL 35896. (Dynamic Campus and OU are individually referred to herein as "a Party" and collectively as "the Parties.")

WHEREAS, OU desires to purchase certain information technology services from Dynamic Campus for management and operation of OU's information technology resources located at its main campus; and

WHEREAS, Dynamic Campus wishes to provide the information technology services described herein in accordance with the terms and conditions hereof.

NOW THEREFORE, in consideration of the payments herein agreed to be made and the covenants and agreement herein contained, the Parties hereto, intending to be legally bound, hereby agree to the following:

## 1. DEFINITIONS

**1.1** **"Services"** shall mean and refer individually and collectively to the tasks and services which Dynamic Campus and OU have agreed Dynamic Campus will perform hereunder, which tasks and services are described with particularity on Schedule A attached hereto and make a part hereof (the "Statement of Work") starting on the Effective Date (as defined in Section 3.1).

**1.2** **"Additional Services"** shall mean a material increase in services which are outside the scope of Services defined in Schedule A, as may be amended. The fees charged by DCS pursuant to this Agreement for providing Services are based upon the current computer hardware and software applications used by OU including, any and all planned expansions in hardware and/or software applications previously disclosed to DCS or recommended to OU during the Initial Term, or any extensions thereof, of this Agreement, a specific number of input/output devices and workstations and other network components, and the scope of Services. If there is a material change in the hardware and software configurations, the number of input/output devices, workstations or other network components, facilities, or if DCS is required to perform services for OU, which the Parties agree materially exceed the scope of Services, or if OU desires to expand the scope of Services, then any such material increase shall be deemed Additional Services and both Parties will mutually agree and enter into an addendum to this Agreement for such Additional Services. It is understood and agreed that before any Additional Services are performed by DCS, OU and DCS shall agree on the scope and additional cost, if any, of the Additional Services.

## 2. SERVICES

The Services to be provided by Dynamic Campus are set forth in the Statement of Work in Schedule A attached hereto and made a part hereof of this Agreement.

**2.1** **Performance of Services.** Dynamic Campus shall apply the following principles in providing Services under this Agreement:

(a)    Help translate OU's needs into technology solutions;

(b)    Identify new and feasible technology opportunities for OU;

(c)    Develop and maintain an integral working relationship with OU;

(d)    Maintain expertise in the use and support of software applications, including those utilized for OU; and

(e)    Be responsive to the users and management of OU.

3.    **TERM AND PAYMENT FOR SERVICES**

**3.1    Term:** This Agreement shall commence on the Effective Date and terminate at midnight on **April 30, 2024** (the "Initial Term"). OU shall have the option to extend the term of this Agreement for an additional two (2) year period and must state intentions to renew or terminate by giving Dynamic Campus notice, in writing, no later than six (6) months prior to the end of the Initial Term.

**3.2    Invoices and Payment Terms:** Dynamic Campus shall submit invoices to OU in accordance with the payment schedule as defined in Schedule B. Invoices shall be submitted by Dynamic Campus at least thirty (30) days before payment is due by OU. OU will pay the invoice by electronic transfer to the account designated by Dynamic Campus. The amounts set forth in Schedule B include all costs and expenses of Dynamic Campus, including all costs of travel and other expenses incurred in the performance of Services pursuant to this Agreement. All such costs and expenses shall be the sole responsibility of Dynamic Campus.

**3.3    Late Payment:** Payment not received within thirty (30) days of the due date will be subject to a daily interest charge. All interest charges will be computed at the monthly interest rate of two percent (2%).

4.    **CONTRACT ADMINISTRATION**

**4.1    Contract Administrator:** OU shall appoint a Contract Administrator who will be delegated the duty and responsibility of maintaining liaison with Dynamic Campus and to oversee the performance of this Agreement. The Contract Administrator, or his or her designee(s), along with OU's President, shall be the only persons authorized to direct or provide guidance to Dynamic Campus regarding its performance of the Services. OU will assign a contract administrator and any changes made by OU to the assigned contract administrator will be communicated to Dynamic Campus at the time of the change.

**4.2    Ownership of Software, Data and Data Processing Equipment:** Subject to Section 9 below, as between the Parties, OU reserves and retains the entire right, title and interest in any and all computing equipment, software, systems, data, information, intellectual property rights, output and other materials or property except for software and computing equipment, if any, that is furnished by Dynamic Campus, that is not developed pursuant to this Agreement and is not owned by OU under the terms of this Agreement (the "Dynamic Campus Materials"), which Dynamic Campus Materials Dynamic Campus retains such rights itself. Upon expiration or earlier termination of this Agreement, Dynamic Campus shall relinquish to OU the use all software and of equipment provided by OU in as good condition as when turned over to Dynamic Campus, reasonable wear and tear excepted. All costs relating to data processing equipment, including but not limited to servers, laptops, workstations, network devices, storage devices, software licenses, and supplies for OU's computer functions shall be the responsibility of OU.

**4.3    Use of Data Processing Equipment:** At no charge to Dynamic Campus, subject to Section 11.5, OU Policies and Procedures, OU shall provide Dynamic Campus reasonable access to all equipment, equipment services, programs and supplies necessary to support the computing needs of OU. OU shall provide Dynamic Campus' staff access to all such equipment so that Dynamic Campus may perform its obligations under this Agreement including, but not limited to, operating all such equipment. If pursuant to a third-party agreement OU incurs additional costs as the result of providing such access to Dynamic Campus, then OU shall be responsible for paying such additional costs. From and after the Effective Date, Dynamic Campus shall identify such additional costs in any agreements whether existing on the Effective Date or recommended by Dynamic Campus to OU, and Dynamic Campus shall exercise its best efforts to minimize or eliminate such additional costs.

**4.4    Access to Personnel:** Subject to Section 11.5, OU Policies and Procedures, Dynamic Campus shall also have reasonable access to OU's management, professional and operating personnel necessary for

performance under this Agreement, as well as to all materials, records, discs, tapes or other information necessary to perform the services contemplated hereby. Dynamic Campus agrees to provide requests for support from OU in a timely and reasonable manner. OU agrees to handle Dynamic Campus' requests for support in a timely and reasonable manner.

**4.5    Use of Third-Party Software/Hardware:** OU shall be solely responsible for obtaining the right for Dynamic Campus from third-party vendors to have access to and to use all software and hardware utilized by OU on the Effective Date in order for Dynamic Campus to perform its Services under this Agreement. OU shall obtain all permissions required from third-party vendors, including sublicenses if any are required at its cost. Dynamic Campus shall not be liable to OU for non-performance of Services pursuant to this Agreement if Dynamic Campus' non-performance is caused by OU's failure to obtain the requisite access or if such third-party fails to provide the requisite access for Dynamic Campus to any such third-party hardware or software. Dynamic Campus shall at all times comply with and abide by the terms and conditions of any third-party software licenses or related agreements.

**4.6    Replacement of Onsite Dynamic Campus Employees:** All Dynamic Campus employees assigned to perform services on OU's premises shall comply with OU's rules of conduct and policies, including rules of conduct and policies pertaining to security, non-discrimination and harassment.  If OU determines that it is not satisfied with the performance of a particular Dynamic Campus employee assigned to perform services for OU, then OU shall communicate, in writing, to the Dynamic Campus President/CEO stating the reasons for OU's dissatisfaction with such Dynamic Campus employee and what changes, if any, it reasonably believes will resolve such dissatisfaction. Dynamic Campus shall within five (5) business days of receipt of the written communication from OU immediately take action and resolve the situation in an agreed time frame to the satisfaction of OU. Such action may include counseling the Dynamic Campus employee to seek to resolve the issues communicated by OU or the replacement of the Dynamic Campus employee at OU. In the event Dynamic Campus replaces an employee at OU, all costs for such employee replacement will be borne and paid by Dynamic Campus.

**4.7    Work Space:** At no charge to Dynamic Campus, subject to Section 11.5, OU Policies and Procedures, OU shall provide Dynamic Campus with appropriately furnished, conveniently located office(s) or other suitable work space(s) for use by the Dynamic Campus staff in performing Services under this Agreement. Also, at no charge to Dynamic Campus, OU shall provide office supplies, telephone service, Internet access and reproduction, telecommunications and office equipment reasonable and necessary to support Dynamic Campus' staff and performance of this Agreement.

OU shall also provide to Dynamic Campus, at no charge to Dynamic Campus, the following in order to allow Dynamic Campus to perform Services under this Agreement.

     (a)    Access to the necessary peripherals such as printers and scanner for Dynamic Campus personnel when working onsite;

     (b)    All utilities, including any special power and air conditioning needed, as determined solely by OU, to operate OU's data processing equipment and storage of computer supplies;

     (c)    Storage, in an area removed from the data processing site, for historical data and backup material that may be needed to reconstruct data files in the event working files are destroyed by natural disasters, fire, riots, or other causes;

     (d)    Computing supplies such as paper, forms, tapes, and disk packs; and

     (e)    Security, fire control equipment, HVAC and janitorial support for OU's data processing facilities and office work space.

**5.    WARRANTIES; LIMITATIONS OF LIABILITY; INDEMNIFICATION**

**5.1     DYNAMIC CAMPUS WARRANTY. DYNAMIC CAMPUS WARRANTS THAT ALL THE PROFESSIONAL STAFF IT ASSIGNS TO PERFORM THE SERVICES UNDER THIS AGREEMENT SHALL HAVE THE EDUCATION AND PROFESSIONAL EXPERIENCE REPRESENTED BY DYNAMIC CAMPUS AND BE COMPETENT TO PERFORM THE SERVICES RENDERED BY THEM IN THE PERFORMANCE OF THIS AGREEMENT. DYNAMIC CAMPUS SHALL ALSO PERFORM ITS SERVICES IN A GOOD AND WORKMANLIKE MANNER CONSISTENT WITH GOOD PROFESSIONAL STANDARDS AND IN COMPLIANCE WITH APPLICABLE LAWS.  DYNAMIC CAMPUS ALSO WARRANTS THAT IT HAS REQUISITE CORPORATE AUTHORITY TO ENTER INTO THIS AGREEMENT AND BE BOUND HEREBY. THE ABOVE WARRANTIES MADE BY DYNAMIC CAMPUS WITH RESPECT TO ITS SERVICES UNDER THIS AGREEMENT AND IS IN LIEU OF ALL OTHER WARRANTIES, EXPRESSED, IMPLIED OR STATUTORY, AS TO THE SERVICES TO BE PROVIDED BY DYNAMIC CAMPUS.**

In the event of loss, damage, or destruction of any date, or the inability of OU to use any service, system or program due to the sole negligence of Dynamic Campus, Dynamic Campus shall take commercially reasonable steps to restore such data, service, system or program within a commercially reasonable period of time. The failure of Dynamic Campus to restore such data, service, system or program within a commercially reasonable time shall be deemed a material breach of this Agreement.

**5.2     OU Warranty.** OU warrants that it has the requisite authority to enter into this Agreement and to be bound hereby. OU warrants that it has the right to the possession of the hardware and software that is used by OU and that, subject to the terms and conditions of agreements with third-party hardware and software vendors, it has the right and power to turn the management and support of such hardware and software over to Dynamic Campus for its use in provision of the Services to OU hereunder. OU further warrants that all hardware and software in use are covered by current vendor maintenance agreements.

**5.3     Limits of Liability:** Dynamic Campus shall not be responsible for schedule delays, inaccuracies or other consequences resulting from incorrect OU data, lateness in delivery of OU's data or the failure of OU's equipment or personnel. In the event OU has failed to maintain Adequate Supporting Material, Dynamic Campus' liability for direct damages shall be limited to the same costs, which would have been incurred for replacement, at Dynamic Campus's then current rates, if OU had so maintained Adequate Supporting Material. Dynamic Campus shall not be liable for any damages resulting or arising from OU's failure to perform its obligations hereunder.

**5.4     Indemnification:** Each Party covenants to perform its responsibilities under this Agreement in a manner that does not, to the knowledge of the applicable Party, infringe, or constitute an infringement or misappropriation of, any patent, trade secret, copyright or other intellectual property right of any third party or violates the terms and conditions of any applicable third-party software or hardware agreement.

**5.4.1**     Dynamic Campus will defend, indemnify and hold OU harmless from and against any loss, cost and expense that OU incurs because of a third-party claim that the provision of Services by Dynamic Campus or the use of a Dynamic Campus provided deliverable or Service by or on behalf of OU infringes any United States patent, copyright, trademark or trade secret of such third-party.  Dynamic Campus' obligations under this indemnification are expressly conditioned on the following:  (i) OU must promptly notify Dynamic Campus of any such claim; (ii) OU must in writing grant Dynamic Campus sole control of the defense of any such claim and of all negotiations for its settlement or compromise (if OU chooses to represent its own interests in any such action, OU may do so at its own expense, but such representation must not prejudice Dynamic Campus' right to control the defense of the claim and negotiate its settlement or compromise); (iii) OU must cooperate with Dynamic Campus to facilitate the settlement or defense of the claim; (iv) any settlement or compromise of the claim will not adversely affect OU, or cause OU to incur additional costs or expenses; and (v) the claim must not arise from modifications made to the deliverables or Services by anyone other than Dynamic Campus or its subcontractor. If any deliverable or Service is, or in Dynamic Campus' reasonable opinion is likely to become, the subject of a covered infringement claim, then Dynamic Campus, at its sole option and expense, will either: (A) obtain for Client the right to continue using the deliverable and Service under the terms of this Agreement; or (B) replace the deliverable or Service with a deliverable or service that is substantially equivalent in function, or modify the deliverable or Service so that it

becomes non-infringing, is substantially equivalent in function and (as applicable) meets the requirements of Schedule A.

**5.4.2**    In addition, Dynamic Campus shall indemnify and hold harmless OU and its directors, employees, agents and affiliates against any and all claims brought against it/them by any employee of Dynamic Campus, including members of the OU IT Team (as defined in Schedule C) alleging joint or co-employment and/or seeking any employment-related compensation, benefits, damages or other obligations from OU; provided, however, Dynamic Campus shall have no liability for claims by any member of the OU IT Team for acts occurring prior to employment of the OU IT Team by Dynamic Campus.

**5.4.3**    Notwithstanding anything herein to the contrary, no indemnity obligation in this Agreement will apply unless the Party claiming indemnification notifies the other Party as soon as practicable of any matter in respect of which the indemnity may apply and of which the notifying Party has knowledge and give the other Party the opportunity to control the response thereto and the defense thereof, provided however that the Party claiming indemnification will have the right to participate in any legal proceedings to contest and defend a claim for indemnification involving a third-party and to be represented by its own attorneys, all at such Party's cost and expense, provided further however that no settlement or compromise of an asserted third-party claim may be made without the prior written consent of the Party claiming indemnification, which consent will not be unreasonably withheld.

6.    **PROVISION OF INSURANCE**

**6.1**    **By Dynamic Campus:** Throughout the term of this Agreement, Dynamic Campus shall maintain in full force and effect comprehensive general liability insurance with limits in an amount of not less than $1,000,000 per occurrence and $2,000,000 in an annual aggregate and Dynamic Campus will name OU as an additional insured on such insurance. Throughout the term of this Agreement, Dynamic Campus shall maintain in full force and effect a policy of Workers Compensation Insurance and State of Alabama unemployment/disability insurance, as mandated by the state, covering all of its employees assigned to render services under this Agreement.

**6.2**    **By OU:** Throughout the term of this Agreement, OU shall maintain in full force and effect comprehensive general liability insurance with limits in an amount of not less than $1,000,000 per occurrence and $2,000,000 in an annual aggregate and OU will name Dynamic Campus as an additional insured on such policy. Throughout the term of this Agreement, OU shall maintain in full force and effect a policy of Workers Compensation Insurance covering all of its employees assigned to render services under this Agreement. OU shall maintain comprehensive property damage insurance insuring the hardware and software, to the extent insurable, in the full replacement amount.

7.    **TERMINATION AND TRANSITION**

**7.1**    **Termination for Breach:** This Agreement may be terminated by a Party (the "Terminating Party") prior to the expiration of its stated term, including any extensions thereof, upon the occurrence of a "Default" by the other Party (the "Terminated Party"). A "Default" shall include any one of the following events of default (individually and collectively, "Event of Default"):

(a)    failure by a Party to timely perform any material obligation under this Agreement after requisite notice and opportunity to cure as provided in the Section 7.2.1 below; or

(b)    any representation or warranty made by either Party herein or in any document executed in connection herewith, or in any document or certificate furnished in connection herewith or pursuant hereto shall have been incorrect in any material respect at the time made; or

(c)    at OU's option, the destruction of OU's property as a result of gross negligence or intentional misconduct, theft or material intentional misrepresentation on the part of a Dynamic Campus employee, contractor or agent which has a material adverse effect upon OU IT operations.

### 7.2    Provisions Relating to Termination:

**7.2.1**    Upon the occurrence of an Event of Default (as defined by 7.1 above), the Terminating Party must give notice of termination to the Terminated Party, identifying in reasonable detail the nature of the Event of Default. Thereupon, the Terminated Party shall have 30 days following receipt of such written notice to correct in all material respects of the Event of Default, at the end of such 30 days the Agreement shall be terminated (the "Termination Date"). Notwithstanding the foregoing to the contrary, in the event the Terminated Party exercises its reasonable best efforts to timely commence cure following the receipt of written notice of any Event of Default, but is unable to cure within the appropriate cure periods for reason not solely within its control, then the Terminating Party shall extend the time to cure for a period of time which is reasonable under the circumstances but which shall not exceed sixty (60) days in any event, and the Termination Date shall be at the end of such extended time. If the Terminated Party timely cures the Event of Default, then the notice of termination shall be ineffective.

**7.2.2**    Regardless of the reason for termination, OU shall pay Dynamic Campus in full for all Services rendered up to and including the Termination Date, and any accrued interest on past due payments, all of which shall be due and payable in accordance with the payment terms of this Agreement.

**7.2.3**    Notwithstanding the foregoing to the contrary, a Default on the part of OU shall not result in the suspension of performance by Dynamic Campus until an orderly transition from Dynamic Campus' performance of the Services to some other party can be effected, not to exceed ninety (90) days in any event. During such transition period OU shall be responsible for paying all fees, which are required for payment hereunder, and any additional reasonable out of pocket costs that Dynamic Campus may incur during the transition period.

### 7.3    Transition Over:

**7.3.1**    Prior to the expiration of this Agreement pursuant to its term, Dynamic Campus shall develop a plan for the orderly transition of all Services provided by Dynamic Campus under this Agreement (the "Transition Plan"). Such Transition Plan shall be developed by Dynamic Campus in conjunction with Dynamic Campus' employees, OU's executives and administrators, and such other persons as shall be designated by OU. OU shall fully cooperate with Dynamic Campus in order to develop the Transition Plan. The Transition Plan shall be completed no later than ninety (90) days prior to expiration of this Agreement. It shall cover, inter alia, the orientation of OU's personnel (or a replacement third party) in the operation and maintenance of the systems used and operated by Dynamic Campus in the provision of Services during the term of the Agreement. OU shall notify Dynamic Campus of its acceptance of the Transition Plan within fifteen (15) days of receipt from Dynamic Campus, and if not accepted, OU shall notify Dynamic Campus in writing of the reasons why it does not accept the Transition Plan. In that event, Dynamic Campus agrees to cooperate with OU in good faith to attempt to resolve the issues raised by OU.

**7.3.2**    If due to Dynamic Campus' actions or omissions (i) the Transition Plan is not completed within the aforementioned period, or (ii) if the Transition Plan is completed but an orderly transition is not effected prior to the expiration of the Agreement or the Termination Date, then Dynamic Campus shall continue to perform such Services as may be required by OU, in order to provide Services and operate and maintain OU's systems used and operated by Dynamic Campus in the provision of Services during the term of the Agreement until such time as an orderly transition may be effected, but no later than 90 days after the expiration of the Agreement or Termination Date. Provided, however, during such time period, OU shall only be required to pay Dynamic Campus ninety percent (90%) of the monthly fee required under this Agreement for those Services, which may include transition activities identified in the Transition Plan.

**7.3.3**    In the event of termination of this Agreement following the occurrence of an Event of Default on the part of Dynamic Campus, Dynamic Campus shall immediately upon the issuance of the notice of termination develop a Transition Plan in accordance with the procedures set forth above except, however, that the Transition Plan shall be completed no later than 30 days after the date of the notice of termination. OU shall notify Dynamic Campus of its acceptance of the Transition Plan within fifteen (15) days of receipt from Dynamic Campus, and if not accepted, OU shall notify Dynamic Campus in writing of the reasons why it does not accept the Transition Plan. In that event, Dynamic Campus agrees to cooperate with OU in good faith to attempt to resolve the issues raised by OU, Dynamic Campus shall complete all transition activities associated with the termination by reason of its default no later than 60 days following Dynamic Campus' receipt of OU's acceptance of the Transition Plan.

7.3.4    In the event of termination of this Agreement following the occurrence of an Event of Default on the part of OU, then Dynamic Campus shall, at the sole option of OU, continue to perform such Services as may be required by OU, at its rates then in effect, in order to operate OU's computing systems until such time as an orderly transition may be effected, but no later than 90 days after the Termination Date.

8.    **CONFIDENTIALITY**

8.1    **Confidentiality:** OU and Dynamic Campus shall treat the other's "Confidential Information" as proprietary information. For purposes hereof, "Confidential Information" shall mean manufacturing, engineering, software, business, customer, marketing, financial and other non-public information, reports, or trade secrets relating to the business of Dynamic Campus or OU, as applicable, and created or learned by OU or Dynamic Campus, as applicable, in connection with the performance of this Agreement. Each of OU and Dynamic Campus shall (i) exercise due care to keep in confidence and not disclose Confidential Information to any individual other than its own employees who have a "need to know" in order to perform the obligations of OU or Dynamic Campus, as applicable, under this Agreement; (ii) not duplicate or publish any Confidential Information; and (iii) use Confidential Information only for the purposes authorized herein. The foregoing obligations shall not apply to Confidential Information if, and only to the extent that, it:

(a)    is or becomes public knowledge through no fault of the receiving Party;

(b)    was previously known by the receiving Party without restriction on use or disclosure as determined by written evidence; or

(c)    is lawfully provided to the receiving Party without restriction on use or disclosure by an independent third party that has no restriction on use or disclosure to the other Party;

(d)    To the extent the receiving Party is required to disclose Confidential Information of the other Party pursuant to applicable law or regulation, the disclosing Party (i.e., the Party who is disclosing to a third-party information which is confidential to the other Party to this Agreement) shall promptly notify the other Party and afford such other Party the opportunity to prevent or limit such disclosure. If the other Party is not successful in preventing or limiting the disclosure of its Confidential Information, the receiving Party may disclose only such portion of the Confidential Information of the other Party as is reasonably required to comply with the disclosure request and such disclosure must be subject to the highest level of protection available to the receiving Party.

8.2    **FERPA:** In accordance with FERPA, 20 U.S.C. 1232g *et seq.*, 34 C.F.R. Part 99, Dynamic Campus and its employees acting in the course of their employment and performance of the Services under this Agreement are deemed to have a legitimate need to access student data and educational records, then Dynamic Campus and its employees shall comply with the non-disclosure and other requirements of all applicable laws and regulations. Dynamic Campus shall maintain the confidentiality and privacy of all student data and education records and shall implement policies and procedures to ensure such confidentiality and privacy.

8.3    **OU PII:** To effect the purposes of this Agreement, OU may from time to time provide Dynamic Campus with certain Personal Identifiable Information ("PII") of OU's students, faculty and employees that is regulated by various state and federal laws and regulations. Dynamic Campus represents that it maintains appropriate data security measures, including a written information security policy, to protect OU PII consistent with all applicable state and federal laws and regulations. Further, to protect the privacy of OU PII, Dynamic Campus will, for so long as it retains OU PII: (a) maintain the confidentiality of OU PII as set forth in this Section 8; (b) limit access to OU PII to Dynamic Campus' employees, agents and subcontractors who need access to OU PII to fulfill Dynamic Campus' obligations hereunder; (c) require that its agents and subcontractors who have access to OU PII agree to abide by the same restrictions and conditions that apply to Dynamic Campus with regard to such OU PII; and (d) implement appropriate administrative, technical and physical safeguards designed to ensure the security or integrity of such OU PII and protect against unauthorized access to or use of such OU PII.

9.    **OWNERSHIP OF WORK PRODUCT AND INTELLECTUAL PROPERTY**

Ownership of software and documentation developed by Dynamic Campus, either directly or indirectly, during the term of this Agreement shall be governed and determined in the following manner:

9.1    "Intellectual Property Rights" shall mean all patents, trade secrets, and copyrights in, covering, and relating to software and documentation made, created, conceived, developed, improved or modified by Dynamic Campus in the performance of Services under this Agreement.

9.2    All worldwide right, title and interest in Intellectual Property Rights in, to or relating to (i) improvements in software and documentation not owned by or licensed to Dynamic Campus by a third-party (excluding software and documentation sublicensed to Dynamic Campus pursuant to licenses granted to OU by third-parties), which improvements are made, conceived or developed by Dynamic Campus in the performance of its Services under this Agreement, (ii) documentation (including user documentation), flow charts, processes, and tutorials related to the use of the computer hardware and software applications operated and used by Dynamic Campus pursuant to this Agreement that are created, modified, conceived or developed in the performance of Services under this Agreement, (iii) any and all data, including modifications to OU data and information, created or generated by use of any of the computer hardware or software applications operated or used by Dynamic Campus pursuant to this Agreement, and (iv) any deliverables provided by Dynamic Campus to OU during the term of this Agreement (other than the additional modules and sub-routines and stand-along programs of Section 9.3) shall vest exclusively in OU, with no right or license, express or implied, granted to Dynamic Campus.

9.3    All worldwide right, title and interest in Intellectual Property Rights in, to, or relating to new software, including without limitation, additional modules and sub-routines and stand-alone programs, and related documentation made, conceived or developed by Dynamic Campus in the performance of its Services under this Agreement shall vest exclusively with OU. OU hereby grants and agrees to grant to Dynamic Campus a perpetual, royalty-free, and non-exclusive right and license under such Intellectual Property to use such additional modules and subroutines and stand-alone programs for the benefit of other customers of Dynamic Campus.

9.4    Dynamic Campus hereby grants and agrees to grant to OU a perpetual, royalty-free, and non-exclusive right and license under all Intellectual Property to use Dynamic Campus Materials for the benefit of OU, its successors and assigns.

9.5    Notwithstanding Section 9.3, Intellectual Property Rights in any new software, including without limitation, additional modules and sub-routines and stand-alone programs, and related documentation made, conceived or developed by Dynamic Campus in the performance of its Services under this Agreement shall vest in OU without any future royalty or right to use license fees payable by either Party to the other Party unless previously agreed to by both Parties under a separate written agreement.

10.    **DISPUTES**

10.1    **Dispute Resolution and Escalation Procedures:** Disputes between the Parties under this Agreement shall be resolved in accordance with the following procedures. Prior to commencement of non-binding mediation, as provided for in section 10.2, the Parties shall first seek to resolve any disputes by a meeting between the Contract Administrator and the Dynamic Campus Executive responsible for OU. If the dispute is not resolved within thirty (30) days of such dispute being identified by either Party to the other Party, then either Party may request a meeting between the Presidents of OU and Dynamic Campus, any such meeting must occur within ten (10) business days of the request unless otherwise agreed to by both Parties. If the Presidents are unable to resolve the dispute, or if either President fails to meet with the other for any reason, then the dispute may be immediately submitted to non-binding mediation as provided below.

10.2    **Non-binding Mediation:** In the event the Parties cannot resolve a dispute which arises between them in accordance with the procedure set out above, the Parties shall then submit the dispute to non-binding mediation. Either Party may request such mediation by sending a written notice to the other Party and the mediation shall be held in a mutually agreeable place within Madison County, Alabama, at a mutually agreeable time, within

thirty (30) days of the date of request for such mediation. The Parties shall select a mediator who is acceptable to both of them, and if they cannot agree on a mediator, then each shall select its own mediator, and the two mediators shall serve in tandem to mediate the dispute.

**10.3    Injunctive Relief:** Notwithstanding the foregoing, each Party shall have the right to seek injunctive relief against the other Party pending resolution of the dispute under such circumstances if the Party reasonably believes that its property or its interests hereunder or the status quo or specific performance hereunder may be compromised or in jeopardy.

## 11.    MISCELLANEOUS PROVISIONS

### 11.1    Non-Solicitation:

**11.1.1**    Except as otherwise provided in Schedule A, beginning on the Effective Date and continuing for a period of one year from the expiration or termination of this Agreement, OU shall not, without Dynamic Campus' prior written consent (which consent may be withheld at Dynamic Campus' sole discretion), employ or hire as an independent consultant any employee of Dynamic Campus who performed work under this Agreement.

**11.1.2**    Beginning on the Effective Date and continuing for a period of one year from the expiration or termination of this Agreement, Dynamic Campus shall not, without OU's prior written consent (which consent may be withheld at OU's sole discretion), employ or hire as an independent consultant any employee of OU.

**11.1.3**    In the event of a breach of the provisions of this section 11.1, without requirement for following the dispute resolution procedures defined herein, take any and all remedies at law or in equity to enforce the provisions of this section 11.1, including but not limited to, seeking injunctive relief to enforce adherence to the provisions of this section. The Parties acknowledge that it will be difficult, if not impossible, to determine damages caused by violations of the provisions of this section 11.1 and a remedy at law may not be adequate, and therefore the Parties may seek injunctive relief without having first to seek a remedy at law.

**11.2    Taxes:** The payments by OU under this Agreement do not include charges for any taxes, which now or in the future may be deemed by a taxing authority to be applicable to the Services provided by Dynamic Campus. In the event a taxing authority determines now or in the future that such services are subject to sales tax, Dynamic Campus shall invoice such sales taxes to OU and OU shall pay same simultaneously with the payment to which sales taxes relate. OU hereby represents that it is not currently subject to any sales or use taxes and will notify Dynamic Campus in a timely manner if OU becomes subject to any such sales or use tax. Dynamic Campus further acknowledges that OU will not withhold any amounts in respect to federal, state or local taxes from amounts payable by OU hereunder and it shall be the exclusive responsibility of Dynamic Campus to pay all amounts due in respect of applicable federal, state and local taxes, including payroll taxes for individuals assigned by Dynamic Campus to work at OU. Dynamic Campus shall also be solely responsible to pay all of its income taxes, gross receipts taxes, unemployment insurance taxes, personal property taxes and related taxes which shall not be the responsibility of OU.

**11.3    Force Majeure:** If either Dynamic Campus or OU is prevented from performing any task hereunder, in whole or in part, as a result of a cause beyond its reasonable control, which may include an act of God, war, civil disturbance, organized labor dispute, an act of terror, such failure to perform shall not be an Event of Default or grounds for termination of this Agreement.

**11.4    Independent Contractor Status:** Dynamic Campus and OU acknowledge and agree that Dynamic Campus is and shall be an independent contractor; that neither Dynamic Campus nor any of its employees, representatives or agents is, or shall be deemed to be, an employee, partner or joint venture of OU; and that neither Dynamic Campus nor any of its employees, representatives or agents shall be entitled to any employee benefits under any employee benefit plan, including medical, insurance and other similar plans, of OU. Dynamic Campus shall be responsible for paying all applicable wages, salaries, federal and state taxes, withholding, social security, insurance and other benefits associated with its employees. Both Parties acknowledge that Dynamic Campus is not an employee of OU for state or federal tax purposes. Dynamic Campus shall retain the right to perform the same or similar services

for others during the term of this Agreement. OU will not (a) withhold FICA (social security) from payments; nor (b) make state of federal unemployment insurance contributions on behalf of Dynamic Campus; nor (c) withhold state or federal income tax from payments made to Dynamic Campus.

**11.5     OU Policies and Procedures:** Dynamic Campus agrees that it and its employees shall comply with all applicable OU policies and procedures of which OU has apprised or otherwise notified Dynamic Campus, together with all other laws and regulations generally applicable to OU's operation, including but not limited to those regarding conditions of work, access to and use of OU's offices, facilities, work space, support services, supplies, data processing equipment and software.

**11.6     Severability:** Each provision of this Agreement shall be a separate and distinct covenant and, if declared illegal, unenforceable, or in conflict with any governing law, shall not affect the validity of the remaining portion of this Agreement.

**11.7     Controlling Law and Venue:** This Agreement shall be governed by the laws of the State of Texas, without reference to rules of conflict of laws. Any litigation between the Parties arising out of or relative to this Agreement shall be filed and maintained only in a federal or state court of competent jurisdiction situated in, or having proper venue over civil actions arising in, Madison County, Alabama. In the event the Parties agree to arbitrate any dispute arising under this Agreement, such arbitration shall be conducted in Madison County, Alabama.

**11.8     Nondiscrimination:** Neither OU nor Dynamic Campus shall, in the performance of this Agreement, engage in any unlawful discrimination against any person because of race, religion, color, national origin, sex, handicap or age.

**11.9     Notice:** Any notice required or permitted to be given to either Party under this Agreement shall be effective upon deposit in the United States certified mail, postage prepaid, addressed as follows:

Notice to OU:                          Dr. Leslie Pollard, President
                                       Oakwood University
                                       7000 Adventist Blvd NW
                                       Huntsville, AL  35896

Notice to Dynamic Campus:              Michael L. Glubke, President
                                       Dynamic Campus Solutions, Inc.
                                       2806 Flintrock Trace, Suite A205
                                       Austin, TX  78738

**11.10     Binding Effect:** This Agreement and all future amendments shall inure to the benefit of, and shall be binding, on both Parties and their respective heirs, successors, and assigns.

**11.11     Assignment:** This Agreement may not be assigned by either Party without the prior written consent of the other Party, which consent shall not be unreasonably withheld.  Subject to Sections 1.1 and 1.2, a merger or consolidation of either Party with or into another entity or a change of control will not constitute an assignment for purposes of this provision.

**11.12     Waiver:** Any waiver by Dynamic Campus or OU of any provision of this Agreement shall not imply a subsequent waiver of that or any other provision, and any waiver must be signed in writing by the Party against whom such waiver is to be construed.

**11.13     Expenses for Enforcement:** Each Party shall bear their own attorneys' fees and costs incurred in the event of any mediation, suit, hearing or other proceeding brought to enforce the provision of this Agreement.

**11.14     Entire Agreement/Amendments:** This Agreement, together with the Schedules hereto, embodies the entire agreement and understanding between the Parties hereto and supersedes all prior understandings

and agreements, whether written or oral, between the Parties hereto relating to the matter hereof. This Agreement (including the Schedules hereto) may not be amended or modified except in writing signed by the Parties hereto.

IN WITNESS WHEREOF, the Parties hereto have caused their names to be affixed hereto as of the date adjacent to their respective signatures below.

**OAKWOOD UNIVERSITY**

*Sabrina R. Cotton*
_____
**Sabrina R. Cotton,**
**Vice President for Financial Administration**
04/23/2019
_____
Date

**Dynamic Campus Solutions, Inc.**

_____
Michael L. Glubke, President

4/29/19
_____
Date

## SCHEDULE A

## STATEMENT OF WORK

## INFORMATION TECHNOLOGY SERVICES AGREEMENT

## BETWEEN

## OAKWOOD UNIVERSITY and DYNAMIC CAMPUS SOLUTIONS, INC.

This Statement of Work ("SOW") is part of the Information Technology Services Agreement (the "Agreement") between Oakwood University and Dynamic Campus Solutions, Inc. ("Dynamic Campus"). In the event of any conflict between this SOW and the Agreement, the Agreement shall take precedence. This SOW identifies the information technology services (the "Services") that Dynamic Campus has agreed to provide to Oakwood University pursuant to and during the term of the Agreement and Schedule D contains the illustrative plans for the first three years of the partnership.

## I. DYNAMIC CAMPUS RESPONSIBILITIES

The success of this shared partnership is fully dependent on all Parties (Dynamic Campus and Oakwood University) fulfilling their designated responsibilities on time and per specifications defined through the leadership and planning provided by the Oakwood University Contract Administrator and the Dynamic Campus CIO. Regular reporting on partnership priorities will be provided to enable each partner to make any required adjustments in resources or performance outcome goals. Dynamic Campus is fully committed to managing the partnership for success and will make every effort to reach the intended outcomes, including providing as Services all of the IT services being performed by the Oakwood University IT Department as of the Effective Date and such other services as defined by the Parties during the term of the Agreement. Given the shared responsibility, Dynamic Campus will put forth our best effort to achieve outcomes; however, Dynamic Campus does not guarantee the achievement of outcomes because achievement is a joint effort by both parties.

### A. Dynamic Campus Executive Leadership Services

1. The assigned Dynamic Campus Executive will provide oversight services and will coordinate with the CIO, the Oakwood University Contract Administrator and other appropriate Oakwood University executive committee(s) to provide input on industry trends, support information technology strategic planning, and assess Oakwood University satisfaction with Services performed by Dynamic Campus.
2. Oversee the continuous development and implementation of professional development programs for Dynamic Campus on-site staff including associated professional development programs, collegiate and technology meetings and conferences, and professional exchanges.

### B. Start Up Period (Begins on Effective Date)

During the startup period (the initial 90 to 120 days after the Effective Date of the Agreement defined as ("Start Up"), Dynamic Campus shall install, in stages, and perform the following:

1. Provide a Start Up CIO, reporting to the Oakwood University President or CFO (the Contract Administrator, "CA"), to assume leadership responsibility for the Oakwood University IT Department and coordinate the Services of this SOW pursuant to the Agreement and as mutually agreed to with the Oakwood University Contract Administrator.
2. Provide leadership and management of technical support activities consistent with installing and maintaining operational continuity, including providing as Services all of the agreed upon

IT services being performed by the Oakwood University IT Department as of the Effective Date and such other services as defined by the Parties.

3. Immediately hire as employees of Dynamic Campus, effective on the Effective Date, the Oakwood University IT Team, as defined in Schedule C, to perform, together with other Dynamic Campus employees, the Services under this Agreement (collectively, the "DSC IT Team"). Dynamic Campus agrees to compensate the Oakwood University IT Team as defined in Schedule C. Oakwood University and Dynamic Campus agree that all decisions during the Start Up Period regarding the Oakwood University IT Team and the DSC IT Team, including compensation, retention, assignment and termination, shall be the sole decision of Dynamic Campus, and Dynamic Campus shall indemnify Oakwood University for any and all employment related claims that may be brought by any member of the Oakwood University IT Team or the DSC IT Team for any actions occurring at Start Up and thereafter, including as set forth in Section 5.4.2 of the Agreement.

4. Provide appropriate Dynamic Campus on-campus staff for Start Up and coordinate the deployment of Dynamic Campus corporate-based shared services staff.

5. Identify the total inventory of software, hardware, facilities, policies and services supported under the terms of this SOW as of the Start Up of this SOW; it being understood that the foregoing inventory shall be updated in writing by agreement of the Parties from time to time on an as-necessary basis during the term of this Agreement.

6. Perform technical assessment activities consistent with establishing remote network alerts to the Dynamic Campus on-site and remote resources.

7. Perform a technical assessment of the administrative and academic systems, including all hardware and software, and prepare a report summarizing findings and recommendations, including, but not limited to, currency and functionality of all software and hardware, sufficiency of hardware to provide backup and disaster recovery for Oakwood University data and information.

8. Perform an information security assessment, identifying any high-risk concerns that must be rectified as soon as possible, and develop a plan and submit recommendations to address all high-risk concerns to be reviewed and approved by the Oakwood University leadership team.

9. Develop an initial project list covering the Start Up Period to establish timeframes, priorities, responsibilities and effort levels to accomplish the IT objectives, ongoing support and identify any new IT projects. The project plan list will summarize the activities, reporting relationships, prioritized tasks and staff task assignments to be reviewed with the CA.

10. Initiate the development of the Annual Work Plan ("AWP"), which provides the tactical basis for the Services and in addition it prioritizes activities to realize results as quickly as possible. It includes projects, priorities, funding (if approved by Oakwood University) and staffing consistent with the objectives and obligations of this Agreement, including this SOW.

11. Establish communication and working relationships with Oakwood University management and leadership.

12. Establish communication and working relationships with Oakwood University departmental staff to provide continuous support to their respective service functions.

13. Ensure that Start Up project list, including but not limited to the initial AWP drafted during the Start Up Period, methodologies, and information will be transferred from the Start Up personnel to the permanent on-site Dynamic Campus staff.

## C.  CIO Start Up Support Period

During the CIO Start Up support period (approximately 90 to 120 days after the Effective Date of the Agreement defined as "Start Up Period"), Dynamic Campus shall install, in stages, staff and methodologies to perform the following:

1. Provide a permanent CIO to replace the Start Up CIO and supporting resources that will include a Dynamic Campus executive leader along with other Dynamic Campus resources to support the transition from the Start Up CIO in assuming the responsibility for Oakwood University's current IT operations.
2. Prepare a CIO transition support plan during the Start Up Period to establish timeframes, priorities, responsibilities and effort levels to accomplish the transition objectives, ongoing support and new projects. The plan will detail all the transition activities, reporting relationships, prioritized tasks, and staff task assignments.
3. Provide and schedule the appropriate Dynamic Campus staff resources and coordinate the deployment of Dynamic Campus corporate-based on-demand staff.
4. Initiate activities consistent with Dynamic Campus transition methodology and install management and operating practices consistent with industry guidelines and standard methodology.
5. Finalize the Annual Work Plan ("AWP") which provides the tactical basis for the Services for the twelve (12) months following the Start Up Period prioritizes activities to realize results as quickly as possible. It includes projects, priorities, funding, and staffing consistent with contract objectives.
6. Provide management and technical support activities consistent with maintaining operational continuity, including developing and providing training, tutorials and user documentation for the use of the hardware and software related to the Services.
7. Establish communication and working relationships with Oakwood University executives and Oakwood University departmental staff to provide continuous support to their respective service functions. and such other services as defined by the Parties during the term of the Agreement.
8. Ensure that transition plans of action, including but not limited to the initial AWP drafted during the transition period, methodologies, and information will be transferred from the Start Up CIO to the permanent CIO.

### D.  On-Site Chief Information Officer

The permanent Dynamic Campus Chief Information Officer ("CIO") will assume all day-to-day responsibility for the strategic direction of the information technology services. The CIO shall provide leadership and management oversight to ensure a successful delivery of all Services. The CIO, and other Dynamic Campus executives, will provide Oakwood University with thought leadership and recommendations in areas such as:

- Technology opportunities and issues specific to higher education.
- Critical success factors influencing competitive position.
- Operational efficiencies of functional departments achieved through the cost-effective application of information technology.
- System security.
- Information Technology Policy and regulatory compliance.
- Data backup and disaster recovery.

The CIO's responsibilities include:

1. Meet monthly, or as requested, with the CA (designated by Oakwood University) and/or senior management to discuss services, progress, and provide consultation.
2. Maintain close communication with Oakwood University to ensure service levels and outcomes are achieved, Dynamic Campus best-practice methodologies are implemented, and tactical plans are in place.
3. Deliver presentations to Boards, committees and/or external groups as requested by Oakwood University.
4. Oversee the on-site operations and service performance against the relevant service levels on a continuing basis or as requested by Oakwood University.
5. Direct the strategic activities and direction of the Dynamic Campus information technology staff.
6. Provide strategic guidance in support of the realization of Oakwood University's mission and vision.
7. Present the Annual Work Plan (AWP) to the Oakwood University Contract Administrator, within the established Oakwood University annual budget process, and implement the agreed upon plan. The AWP

shall reflect the initiatives established through Oakwood University planning activities, the evolution of information technologies, and recommendations relating to keeping technology current.

8. Provide executive-level technology guidance and direction.

9. Develop and recommend information technology policies to ensure the appropriate acquisition, use, and cost-effective application of technology.

10. Provide guidance in the development of an effective information technology advisory structure with the appropriate policies and procedures to enable it to set priorities and render operational decisions effectively. Oakwood University will determine the structure that is best suited to its culture and needs.

11. Provide monthly status reports to the CA, and other stakeholders as defined by Oakwood University, detailing progress on the AWP, pending issues and recommendations for action. The monthly status reports shall also include, but not be limited to, performance monitoring, bandwidth utilization, technical issues, help desk status reports, and hardware/software recommendations.

12. Propose best-practice policies that ensure the appropriate security of information technology resources. Implement the policies that are approved and supported by Oakwood University.

13. Respond to audit recommendations and findings and formulate and implement corrective actions as required based on Oakwood University-specified work priorities.

14. Serve as a technology advocate by promoting the effective use, support, and realization of innovative technologies at Oakwood University.

15. Provide Services pursuant to the Agreement using existing hardware and software until Oakwood University upgrades or changes such hardware and/or software, and then provide Services using such upgraded/changed hardware and software.

E. **Technical Director**

As directed by the CIO, the Dynamic Campus Technical Director ("TD") will manage and supervise all the day-to-day delivery of Services provided by the Dynamic Campus staff, including all enterprise applications and associated computing environment, university web/portal services, systems administration, peripheral device support including storage solutions, database services, user support services, network services, backup and recovery services, and other services provided by the Oakwood University IT Department as of the Effective Date and such other services as defined by the Parties during the term of the Agreement. The CIO shall provide leadership and management oversight of the TD to ensure a successful delivery of all Services on a timely and acceptable basis.

The TD's responsibilities include:

1. Meet regularly, or as requested, with the CIO, and/or senior management to discuss issues and provide consultation.

2. Maintain close communication with CIO to ensure service levels and outcomes are achieved, Dynamic Campus management methodologies are implemented, tactical plans are in place, and the mutually agreed-upon technology advisory structure and Services are functioning in accordance with Oakwood University requirements and this Agreement.

3. Make presentations to boards, committees and/or external groups in support of, or as requested by, the CIO.

4. Review on-site operations and service performance against the relevant service levels on a continuing basis or as requested by the CIO.

5. Direct the activities and manage the Dynamic Campus IT Team performing Services under this Agreement.

6. Provide guidance, support, management and recommendations as they relate to the technology environment.

7. Assist with developing and presenting the AWPs to the CIO and implement the agreed upon AWP which shall reflect the initiatives established through Oakwood University planning activities, the evolution of information technologies, and recommendations approved by Oakwood University relating to keeping technology current.

8. Provide monthly status reports to the CIO detailing progress on the applicable AWP, pending issues, and recommendations for action.

9. Propose and direct the implementation of policies that ensure the appropriate security of information technology resources.

10. Assess policies and procedures for purchasing information technology resources and establish new practices based upon this assessment.
11. Serve as a technology advocate by promoting the use, support, and realization of innovative technologies at Oakwood University.
12. Implement and oversee a standardized change control process.
13. Oversee the effective management of all IT projects.
14. Fulfill the duties of the CIO in his/her absence as directed by the CIO.
15. Provide Services pursuant to the Agreement using existing hardware and software until Oakwood University upgrades or changes such hardware and/or software, and then provide Services using such upgraded/changed hardware and software.

F.  **Enterprise Solution Services**

Dynamic Campus shall manage the Oakwood University Colleague enterprise application solutions and other enterprise level applications and the inventory of software, hardware, facilities, policies and services supported under the terms of this SOW (the "Enterprise Solutions"). The applications include Jenzabar EX ERP, D2L learning management system, PowerFAIDS financial aid system, and other ancillary supporting systems. Dynamic Campus shall perform the following tasks:

1.  Review project proposals, timeframes, funding limitations, procedures for accomplishing administrative computing projects, staffing requirements, and allocation of resources.
2.  Provide direction and oversight necessary for the administration of systems Enterprise Solutions, infrastructure and database for Enterprise Solutions.
3.  Provide system configuration and usage guidance, including training, tutorials and user documentation to the IT team as well as the administrative and academic user community.
4.  Support Oakwood University departmental staff and administration with the identification, evaluation, selection, support, and maintenance of the Enterprise Solutions.
5.  Provide systems analysis and problem-solving support to provide efficient and effective use of the Enterprise Solutions.
6.  Provide systems maintenance, appropriate use, production and problem-solving support, and departmental consulting.
7.  Develop project plans specifying scope, goals and objectives, strategy, schedules, risks, contingencies, and allocation of available Dynamic Campus and Oakwood University resources.
8.  Prepare project status reports and keep Dynamic Campus, Oakwood University management, and the Oakwood University community informed of project status and related issues.
9.  Direct the implementation of quality assurance methodologies covering test plans, change/patch management, and problem management.
10. Establish technical standards to ensure the long-term, cost effective management and support of the currently installed Enterprise Solutions.
11. Provide database administration functions to ensure the effective operation of Enterprise Solutions.
12. Identify current software versions, including monitoring and tracking software licenses to ensure compliance, and preparing an upgrade project plan in collaboration with Oakwood University.
13. Provide sufficient ongoing training, tutorials and user documentation to Dynamic Campus staff responsible for the Enterprise Solutions.
14. Prepare hardware environment documentation based on vendor specifications for purchasing servers/devices needed for upgrades or future enhancements.
15. Negotiate with vendors for the selected Enterprise Solutions.
16. Arrange and perform hardware installation at the Oakwood University data center as agreed upon with Oakwood University.
17. Install upgrades and patches to Enterprise Solutions as released by the solution vendors in a timely manner as agreed upon with Oakwood University.
18. Perform data center network systems administration duties for the Enterprise Solutions.
19. Direct and manage the decommissioning of obsolete hardware and software that are no longer required.
20. Provide management and technical support activities consistent with maintaining operational continuity, including developing and providing training, tutorials and user documentation for the use of the hardware and software related to the Services.

21. Provide services in developing and supporting effective integrations between the listed enterprise application solutions.

G. **Data Base Administration (DBA) Services**

1. The database administration portion of Services coordinates the design, implementation, and maintenance of an effective data structure of entities and relationships that comprise integrated enterprise-wide databases. Dynamic Campus shall be responsible for the performance of the following database administration Services;

2. Design and maintain logical and physical databases and review descriptions of changes to database design.

3. Establish physical database parameters. Code database descriptions and specify identifiers of database management system or direct others in coding database descriptions.

4. Calculate optimum values for database parameters such as amount of space, buffering, and memory to be configured.

5. Apply vendor-provided maintenance to DBMS systems and applications software where database-specific expertise is required.

6. Test and correct errors and refine changes to databases.

7. Enter codes to create production and test databases.

8. Monitor and tune database performance.

9. Provide refresh, restore, and backup services for optimal service.

10. Test the backups to ensure the systems can be restored properly from the backups as required and in preparation for an unforeseen disaster.

11. Execute fixes, patches, and upgrades for the enterprise solutions utilizing standard industry methodology.

12. Coordinate maintenance, patches, upgrades, and fixes with the Oakwood University Contract Administrator; and to the extent reasonably possible, schedule such items during off peak hours.

13. Coordination with the TD to lead the software patch process. Patch coordination includes:

    a) Gathering information, reviewing documentation, assessing technical patch impact (identifying the customized objects that have been patched based on Oakwood University documentation).

    b) Recommending patches to apply, and scheduling patch application and migration.

    c) Coordinating the implementation of patches with Oakwood University staff.

    d) Providing, developing and providing training, tutorials and user documentation for the use of the patches.

H. **Dashboards and Reporting**

1. Dynamic Campus will deploy executive dashboards, as defined within the agreed upon AWP, to support timely decision-making by providing current status and historical trends of the college's key performance indicators at a glance.

2. Dynamic Campus will support the existing reporting tools to extract complete, accurate, timely data from the Jenzabar EX ERP system and supporting database.

I. **Systems Administration and Network Management Services**

The Systems Administration and Network Management Services are part of the Services provided by Dynamic Campus and are provided to support technical leadership, decision-making, and logistics to ensure continuous computer and network operations, infrastructure development and the tactical integration of varied technical services, technology, and work programs.

The Dynamic Campus systems administration and network services team, supplemented by Dynamic Campus Shared Services, described herein shall provide the following services to Oakwood University:

1. Review network infrastructure/operations for the computing environment, including Enterprise Solutions.
2. Integrate patches and upgrades to the extent that they impact the systems administration or network services.
3. Develop a project plan that includes the activity, resources, and timeframes for maintaining and enhancing the network.
4. Document the existing network infrastructure.
5. Develop and implement policies and procedures to ensure that the Enterprise Solutions, including operating systems and network operating environment are consistent.
6. Implement data backup procedures, which include new policies, procedures, and testing of data backup schemes for key file servers.
7. Develop and present an initial disaster recovery plan for the essential information technology resources that Oakwood University may require to support operational continuity during a disaster and implement Oakwood University approved disaster recovery plans.
8. Specify and implement appropriate firewall systems as needed and approved by Oakwood University.
9. Implement controlled, monitored, and secured network access to the application environment. Establish necessary technologies and plans so that network systems and devices can be monitored 24x7.
10. Identify single point-of-failure risks and provide Oakwood University with findings and recommendations.
11. Review network and Internet bandwidth utilization trends and make recommendations to Oakwood University as needed and implement Oakwood University approved recommendations.
12. Evaluate new software and hardware to determine usefulness and compatibility with Oakwood University's Enterprise Solutions.
13. Evaluate proposed information technology projects to assess adequacy of existing hardware and recommend purchase of new equipment and software as required.
14. Manage maintenance contracts for Enterprise Solutions, including the network equipment and software, and make recommendations as appropriate.
15. Adjust hours of work, priorities, and staff assignments to ensure efficient and uninterrupted operation.
16. Provide Oakwood University with proactive and ongoing operational advice regarding server and network administration, upgrades, performance enhancement, security and capacity planning, and implement those approved by Oakwood University.
17. Create a service call matrix and methodology that includes staff and vendor contacts.

J.  **User Support Services**

User support staff and management oversight of the user support staff will be provided by Dynamic Campus. Dynamic Campus staff will be responsible for the delivery of Help Desk, Audio Visual, and technical support services for Oakwood University. Support requests will be logged, prioritized, and tracked in a call tracking solution as approved by Oakwood University. Includes the management of Oakwood University student workers that are assigned to IT.

On-site support services for desktop computers, laptops, and other input/output devices throughout campus will be provided by the Dynamic Campus staff to Oakwood University staff and faculty.

K.  **Dynamic Campus Shared Services**

Dynamic Campus Corporate Shared Services support is provided to Dynamic Campus' on-site support staff in carrying out their responsibilities as specified in this SOW. These corporate Shared Services resources are intended to promote efficiency and improve responsiveness by providing a shared corporate staff talent base.

L.  **Client Satisfaction**

Dynamic Campus ensures Oakwood University's satisfaction by conducting periodic executive reviews with the Oakwood University President, Oakwood University CFO, other Oakwood University executives and the Dynamic Campus President, VP of Services, Account Manager, and CIO to review compliance to the service level standards as provided herein, and the effectiveness of the Dynamic Campus Services. Client satisfaction is also accomplished by leveraging Dynamic Campus' extensive array of standards, policies, technical materials, methodologies, and a variety of other resources and experiences that cover nearly every

aspect of the services described herein provided by our on-site and remote teams. These resources are leveraged to provide the services to Oakwood University and to provide the highest level of satisfaction with the services.

## II.    Oakwood University RESPONSIBILITIES

Given the nature of this "shared responsibility" partnership, Dynamic Campus requires that Oakwood University fulfill the following responsibilities to ensure overall success, as funding allows.

1. Fund enterprise application software and implementations.
2. Funding wiring and cabling services.
3. Fund all hardware and software licenses and maintenance.
4. Fund the purchasing of PC equipment for IT site staff, office space, supplies and expense.
5. Hiring and funding student workers that are traditionally assigned to IT.
6. Identify an Oakwood University Contract Administrator (CA) to perform the essential coordination and management duties specified in this agreement and act on tasks and resolve issues as expeditiously as possible.
7. Oakwood University Contract Administrator to meet regularly (at least monthly) with Dynamic Campus on-site CIO to coordinate activities end ensure effective execution of contract obligations.
8. Provide Dynamic Campus with access to Oakwood University's staff, equipment, systems and records necessary to enable Dynamic Campus to perform Services under this Agreement. This may include remote Internet access to provide services from Dynamic Campus' on-site and remote locations.
9. Collaborate on and implement the mutually agreed upon AWP.
10. Recognition by Oakwood University that time is of the essence for establishing priorities and resolving issues with respect to service delivery.
11. Establish reasonable funding for operations, capital expenses, and technology consistent with Oakwood University adopted technology initiatives as identified in this SOW and the AWP.
12. Provide training and appropriate technology for Oakwood University's staff to perform their work using training, tutorials and user documentation provided by Dynamic Campus.
13. Assign Oakwood University staff to participate in the analysis, planning, implementation, and verification testing phases of projects as required.
14. Facilitate and support training logistics scheduling for departments using training, tutorials and user documentation provided by Dynamic Campus.
15. Support compliance with Oakwood University approved policies and standards.
16. Provide timely notification to Dynamic Campus of upcoming events that may have an impact on the Services delivered by Dynamic Campus.
17. Maintain communications with and among Oakwood University constituencies regarding technology plans and progress towards those plans.

SCHEDULE B

PAYMENT SCHEDULE

INFORMATION TECHNOLOGY SERVICES AGREEMENT

BETWEEN

OAKWOOD UNIVERSITY and DYNAMIC CAMPUS SOLUTIONS, INC.

This Payment Schedule is part of the Information Technology Managed Services Agreement (the "Agreement") between Oakwood University ("OU") and Dynamic Campus Solutions, Inc. ("Dynamic Campus") and is all made expressly conditioned upon and subject to Section 3.2 of the Agreement. In the event of any conflict between this Payment Schedule and the Agreement, the Agreement shall take precedence. This Payment Schedule identifies the payments and related terms for the information technology services (the "Services") that Dynamic Campus has agreed to provide OU pursuant to the Agreement.

A.     Payment Schedule

| Period | Monthly |
|---|---|
| May 1, 2019 – April 30, 2020 | $150,000 |
| May 1, 2020 – April 30, 2021 | $175,000 |
| May 1, 2021 – April 30, 2022 | $193,750 |
| May 1, 2022 – April 30, 2023 | $210,417 |
| May 1, 2023 – April 30, 2024 | $230,417 |

M.     Terms

(1)     Invoices will be due as set forth in Section 3.2.

(2)     The above monthly fees include all cost of living adjustments through the Initial Term. In the event that OU extends the Term for an additional two (2) years as provided in Section 3.1 above, all invoices will be subject to an annual cost of living adjustment based upon the greater of (1) a fixed three percent (3%) or (2) the then current US Department of Labor's Bureau of Labor Statistics published CPI index for the region that includes Huntsville, AL.

(3)     The amounts set forth in this Schedule B include all costs and expenses of Dynamic Campus, including all costs of travel and other expenses incurred in the performance of Services pursuant to this Agreement.  All such costs and expenses shall be the sole responsibility of Dynamic Campus.

SCHEDULE C

TRANSITIONING STAFF

INFORMATION TECHNOLOGY SERVICES AGREEMENT

BETWEEN

OAKWOOD UNIVERSITY and DYNAMIC CAMPUS SOLUTIONS, INC.

| Transitioning | Compensation |
|---|---|
| Armand Blankenship | $39,051 |
| Sandra Burton | $45,487 |
| Karen Christmas | $37,526 |
| Chris Dewitt | $49,664 |
| Robert Engram | $49,722 |
| Alicia Juzang | $37,809 |
| Djuvane Martin | $37,360 |
| Cathy Mayfield-Rocker | $45,487 |
| William Mitchell | $41,923 |
| Keith Terrill | $35,163 |
| Gilbert Trott | $41,291 |
| Julian Waddell | $43,953 |
| Arlene Wimbley | $45,599 |
| | |
| Francios Berthier | $11/Hour |
| Talik Taylor | $11/Hour |

## SCHEDULE D

### ILLUSTRATIVE THREE YEAR PLAN

### INFORMATION TECHNOLOGY SERVICES AGREEMENT

### BETWEEN

### OAKWOOD UNIVERSITY and DYNAMIC CAMPUS SOLUTIONS, INC.

This illustrative three (3) year plan is part of the Information Technology Managed Services Agreement (the "Agreement") between Oakwood University ("OU") and Dynamic Campus Solutions, Inc. ("Dynamic Campus") and both parties recognize and agree that this three year plan provides an overview of the major goals for each year. The three year plan also outlines the order of the projects that the parties will collectively undertake. The three year plan is dependent upon both parties and will be adjusted as required throughout the term of this Agreement.



DOCUMENT 118

Dynamic Campus and Oakwood University    Confidential

# Oakwood Technology Plan - Year 1

Dynamic Campus    23

3 Months    3 Months    3 Months    3 Months

## IT Assessment

Initial IT Security & Compliance Assessment → Initial IT Security & Compliance Mitigation → In-depth IT Security & Compliance Assessment
Staffing Assessment
Skills Assessment ——————————► Individual Staff Development Plans
  IT Systems & Hardware Audit

  Vision and Culture
  Best Practices Training ——————► Best Practices Implementation ——— ► Best Practices Training    ► Best Practices Implementation    ► Best Practices Training
    IT – Process Analysis
    Metrics                 Knowledge Management              Maintenance Schedules              Problem Management
    Incident Management     Alerting & Notifications          Change Management

## Enrollment Management BPA & BPR (Recruiting, Enrollment & Retention)

              BPA Recruitment → BPR Recruitment & Fin Aid
              & Fin Aid
                            BPA Admissions  ► BPR Admissions
                            & Advising      & Advising
    Iterative EX Functionality Improvements

Integration Audit              ► Integration Strategy and Research       ► Integration Implementation

## Data Governance & Management

  Identifying All Recruiting, Enrollment and Retention Data Sources
    Establish Data Governance Committee
        Initial Data Governance Standards    Foundational Data Clean-Up (Automated)
                                             Data Clean-Up (Functional)
                                                     Data Warehouse Design



# Oakwood Technology Plan - Year 2

Dynamic Campus

| 3 Months | 3 Months | 3 Months | 3 Months |

## IT Assessment

IT Security & Compliance Risk Mitigation Projects

IT Systems & Hardware Audit

Vision and Culture
Continuous Improvement (ITIL)

Metrics
Incident Management

Knowledge Management
Alerting & Notifications

Maintenance Windows
Change Management

Problem Management

## Enrollment Management BPA & BPR (Recruiting, Enrollment & Retention)

BPA Fin Aid ———→ BPR Fin Aid
& Student Accounts    & Student Accounts

BPA Housing ———→ BPR Housing
& Student Life        & Student Life

BPA Retention ——→ BPR Retention

Iterative EX Functionality

Integration Audit         ▸ Integration Strategy and Research        ▸ Integration Implementation

## Data Governance & Management

Data Clean-Up (Functional)

Data Warehouse Design        ▸    Limited Data Warehouse Implementation

EX Data Dashboard

Develop / Acquire and Implement Accreditation Solution

Data Governance Standards Review

DOCUMENT 118

Dynamic Campus and Oakwood University    Confidential

24



# Oakwood Technology Plan - Year 3

Dynamic Campus

| 3 Months | 3 Months | 3 Months | 3 Months |

## IT Assessment

IT Systems & Hardware Audit

Vision and Culture

Continuous Improvement (ITIL)

Metrics
Incident Management

Knowledge Management
Alerting & Notifications

Maintenance Windows
Change Management

Problem Management

## Enrollment Management, Finance, HR & Payroll BPA & BPR

BPR Retention

BPA Payroll ⟶ BPR Payroll

BPA HR ⟶ BPR HR

BPA Finance ▸ BPR Finance

BPA Career Placement

Iterative EX Functionality

Integration Audit ⟶ Integration Strategy and Research ⟶ Integration Implementation

## Data Governance & Management

Data Clean-Up (Functional)

Data Report Automation

Data Dashboards

Data Portal Design ⟶ Iterative Portal Deployments

Data Governance Standards Review

Dynamic Campus and Oakwood University    Confidential

DOCUMENT 118

25

# EXHIBIT "C"

0:07

greetings I'm Leslie Pollard president of Oakwood University and I welcome you to this vital conversation we are coming

0:14

to you from the beautiful Peters Media Center here on the wonderful Campus of Oakwood University here at Peters we

0:22

house the Oakwood University broadcast network and tonight we present to you the first of a series of vital

0:28

conversations with key student leaders so tonight we are going to be talking to

0:34

the United student movement General Assembly about the truth the truth about

0:39

the technological future of Oakwood University now this is a very important

0:45

topic because as we have discovered in recent months there is no aspect of

0:50

technology that does not impact or affect the lives of our students and so

0:56

we want to have an honest conversation tonight an honest conversation honest about where we've been

1:03

honest about where we are and then honest about where we are going

1:09

and this cannot be done by its by by ourselves and so in this dialogue they

1:15

are facilitators let me introduce you to just a couple of them first of all and

1:21

I'm going to save the best for last first of all I'd like to introduce of course tonight's moderators Dr David

1:28

Richardson the United excuse me the vice president for student life and Mission

1:33

here at Oakwood University and the student co-host who will be co-moderating with him Miss Kalyn

1:40

Griffin here at Oakwood University an outstanding speaker presenter and a

1:45

dynamic student leader let's receive them everyone with a round of applause

1:51

then for the first time in the history of Oakwood given some of the challenges that we have experienced we thought that

1:58

it was important to create a new position to guide us through this Maze

2:04

of technology that is so essential to higher education and we hired someone to

2:10

do exactly that he is our new Chief technology officer his name is Mr Mr

2:16

Carlin Alfred Carlin

2:22

of course we could not do this by ourselves we are supported by our provider company ellucian and those

2:28

representatives are here tonight ellucian the technology service deliverer would you please give them a

2:34

big hand thank you and then our media team I want to get these in our media team Mr Norman

2:41

Jones is the executive director for integrated marketing and public relations here at Oakwood University

2:46

let's give him a hand as well everybody and I said I'm going to say Save The

2:51

Best For Last the leadership of our student body the United student movement

2:58

General Assembly everyone let's give them a big hand and thank you for taking

3:04

to oh could you give yourselves a big hand come on everybody

3:09

thank you very much and now I turn it over to our moderators

3:21

good evening what a wonderful opportunity it is to be with you all tonight this is a big night anytime we

3:28

talk about a conversation a series of conversations with our students it's a big deal and it's a big night so I'm so

3:34

glad to be here tonight I'm Dr David Richardson your vice president for student life and Mission and I'm here

3:39

tonight with uh hi I'm Kalyn Griffin and I represent the Oakland University student body

3:45

wonderful so Dr Pollard said tonight's series is about the truth about our

3:51

technological future and yes tonight we're going to be transparent we're going to ask answer questions and get

3:58

some answers and so we're so excited tonight to be here and I turn it over to to Caitlin and she will introduce our

4:05

first segment tonight um as we get ready for um uh the next step with our Preamble

4:11

thank you our Preamble tonight put your hands together for Mr Carlin Alford

4:17

[Applause] thank you everyone first of all it's

4:23

good to be here this is surreal for me I know I'm new to higher ed I said we're

4:29

going to be transparent tonight so I'm going to tell you that but I am an oakwoodite not only I'm an oakwoodite

4:34

I'm a former USM officer um the the office that I held when I was

4:40

35 years ago however long ago it was uh was athletic Vice I happen to be a part

4:46

of the most controversial USM ever we were the the lowest financially cleared

4:52

the highest financial aid uh most suspended

4:57

um what else USM but what we were is we were

5:04

intentional about speaking out and so tonight we're glad that you all

5:11

are here because we need to speak out about what happens on our campus we need

███

██████████████████████████████
████████

███

███████████████████████████████████████
███

███









making this up thousands of Zoom licenses everybody who knows what Zoom is raise your hand

13:02

likely you have a student version of that or you had one if you're an upperclassman

13:09

thousands of Zoom accounts were purchased by Oakland University so that classes could be conducted remotely

13:16

okay when you have a license it gives you a

13:22

seat in fact illusion guys when we we call subscribers seats many times right

13:28

so each one of you had a seat if you had a zoom account but that seat comes with an Open Door

13:36

and in order to occupy that seat you have to walk through a door that door is

13:41

called the internet right you log on put your email address in really what it's doing is it's saying

13:49

you have a key and you just open the door and you walked in now is everybody

13:54

always I have a 14 year old son hope he never sees this he's gonna be mad at me

13:59

I don't trust him with anything teenage boy okay

14:05

opening a door he rarely closes it and locks it so if you think of your seat in the

14:11

thousands of seats that we had there were many open doors what happens when a bad actor walks by and sees an

14:19

Open Door probably gonna walk through so us Oakwood just like everybody else the

14:27

rest of the educational world not just higher education all the way down to Elementary my daughter in fourth grade

14:34

was operating on Zoom better than I was and I'm a tech guy right and they were all at home and now all of

14:41

a sudden the world is open

14:46

what do you think is going to happen at my my daughter's elementary school or

14:52

my daughter and Son's Elementary School one of the best Seventh-day Adventist institutions you know we had K through

14:57

uh eight FH Jenkins preparatory school they were ahead and they already had laptops three years prior to that we're

15:04

ready to go but once they opened up the zoom there were bad actors that would crash the meetings and start cursing or

15:11

saying things that were inappropriate cause they could get in through a door and they had to you know Shore up the

15:17

security I'm telling you all that to say where we were so if you start with Co the the

15:23

covet and the pivot that Oakwood had to make just like everybody else we now had an open campus

15:30

there are things that are corridors called uh virtual private Networks vpns

15:35

everybody was given one because teachers had to teach from their homes teachers had to teach from remote locations and

15:41

those places weren't secure not because Oakwood was

15:47

frivolous or not Vigilant but just because they had

15:53

to move quickly like everybody else and standing at the door were bad actors

15:59

so now over the course of a couple of years Bad actors walking around the house

16:06

think of Oakwood as a house walking around the house checking the doors checking the windows to see if

16:12

something is open now spring of last year

16:18

they found an open window they came in

16:23

they locked the window they locked the doors they boarded up the doors they boarded

16:29

up the windows and changed the lock and then they called us

16:35

hey you want the cheesecake that's in your refrigerator you're gonna have to pay us

16:41

a thousand dollars metaphorically it's you know hundreds of

16:46

thousands of dollars that they deal in but I'm doing this as an illustration tell you where we've cut where we were

16:53

and in doing so they literally locked us out from our own stuff

17:00

and we tried to find the extra key looking underneath the mat tried to find each key hide it in the pot and you guys

17:06

don't understand it because everything is key locked now but you know back in the old days the the Dr Richardson you put your spare key in

17:14

a in a flower pot next to the door right couldn't find it no extra key

17:22

and so ended up having to make a move and when the university did that

17:28

they opened it up praise God we're back in our house

17:33

go to the refrigerator because remember it was the cheesecake that was held Ransom right and in this case our cheesecake is our data

17:39

we'll get to that in a second went to the refrigerator to to get our cheesecake that we paid for twice

17:47

paid for it the first time when we bought it we paid for it again to get it unlocked from the Bad actors and we opened up the

17:54

refrigerator and the cheesecake is spoiled

17:59

now we got a problem why was it spoiled

18:05

what happened the refrigerator was unplugged who was in charge of plugging in the

18:10

refrigerator now probably wouldn't have happened if we were we hadn't gotten locked out we

18:16

would have remembered somehow or whatever but we are where we are because there were bad actors

18:23

because of the world environment that caused everybody to Pivot and because those who were responsible

18:30

for keeping the cheesecake refrigerated either forgot or didn't plug the

18:37

refrigerator in are we getting it I'm using food analogies because I'm a food person but

18:45

we're talking about the security of our data and our environment here at Oakwood

18:50

which is impacted by the world environment by Bad actors and quite frankly those who were hired

18:57

to do a job who didn't quite do it now we're not going to throw anybody

19:02

under the bus this the the this evening so you're not going to hear me go into detail about that that's not why we're here but we said we were going to be

19:09

transparent and that's why we're that's why we were in the situation where we

19:15

were now there's another component to this that had to do with just before Christmas

19:20

break right Christmas break came and ouit everybody

19:27

who's ever heard of ouit please raise your hand all right if you've ever had a problem with your laptop ever had a problem

19:33

getting into D2L getting into your classes or whatever you would open up a help desk ticket right or call them or

19:39

call the hotline and they would help you ouit is just a name there was a company

14

19:44

that staffed all of that some very good people some knowledgeable people right

19:50

some of our own people when I say our own people that was ouit

19:56

through a series of events because of what happened with the Cyber attack and because the cheesecake got spoiled and

20:01

nobody could tell us why the refrigerator was unplugged I.E our data why was our data so compromised why

20:07

wasn't it backed up properly or whatever we ended our relationship

20:13

but in ending our relationship all right now we're about to get real in a second everybody in here who's in a dating

20:18

relationship right now you don't have to say who please don't say your name if you're in a dating relationship right now raise your hand

20:25

oh we got a singles Ministry in here okay all right all right those who are in a dating relationship if you've ever

20:31

dated somebody prior to this right and you in the relationship there's

20:37

always this moment all right let's be real I'm sorry but I don't think this is

20:42

gonna work out oh that's good because I was gonna quit anyway okay goodbye no no no you didn't dump me I walked away no

20:49

no no no no no you didn't walk away I let you go right that's what happened

20:54

right and unfortunately the relationship ended before

21:02

the responsibilities were doled out to another company

21:08

so when you left your ID cards were working key fobs were working you could get in

21:15

and see your classes most of you had pre-registered and financially cleared right

21:20

all of that stuff was working but when that when when the company left

21:25

we found out I said we I wasn't here but when we finally we found we found out a

21:31

lot of that stuff was not automated it was a person or a people

21:37

typing this in here and then sending the data here and when you do that and it's not

21:43

connected with a link or automation there's room for error but bigger than that what happens if that person gets

21:50

sick what person has that person what happens that person leaves in the middle of the night with the other other

21:56

the the other part of the company and says we're done the entire campus would be crippled

22:03

that's what happened so when you got back everything that did

22:09

work most of it wasn't working that's because there was no other the

22:15

the company that replaced the company behind ouit contractually wasn't even

16

22:21

under contract until late December at the last minute I think

22:28

we were like New Year's Eve or we were still working off contract and on January 3rd illusion showed up

22:35

they literally flew people in I'm talking like this is the kind of stuff the GE stuff again like Mission

22:41

Impossible stuff like they were flying in Specialists from all over because I'm not exaggerating those the two people

22:47

from Volusia are here San Diego right California he flies in on Monday and flies out on Fridays

22:54

usually flies on Thursday night so he's here because we asked him to be here he's usually on a plane to go back so he

22:59

can get back on Monday and uh Oklahoma he drives nine hours to get here folks

23:07

this is what has been done in order to shore up and to restore repair and

23:14

replace all of the length and the problems that that we had with the exit of The Old Company talking again about

23:20

why we're here all right I know I've talked a lot but this is the biggest part of understanding because when

23:28

you're frustrated with why things are now you know why

23:33

Bad actors environment bad relationship with a company that

23:39

ended and on top all of that we got a bunch of old stuff

23:45

so that is where we started thank you Carl and I thought

23:51

for a minute I was gonna have to jump in but I'm glad you told us where we've come from that's an important conversation as a part of where we're

23:58

going today we're going to talk tonight once again where we're going right where we've come from where we are and then

24:04

where we're going and once again we're talking about transparency this is the tone for tonight uh tonight tonight's

24:12

conversation the truth about our technological future so you've said a lot about where we've come from

24:17

and we're so glad that elucin jumped out of the air like Mission Impossible and we're so glad that you've come as well

24:24

to ensure that we will have progress so talk to us about where we are so we've

24:29

heard where we've come from what we had to deal with what our students had to face when they

24:34

came back and our faculty and staff when they came back yeah now tell us where we

24:39

are currently and I'm going to make sure that we keep you to your 10 minutes thank you







where we are today there is a central retirement this is all about data this

26:50

whole thing is about data all right it's about data everybody say data

26:55

there's a central repository called genzibar right and before the Cyber attack it helped

27:02

all of your data here on campus right not the greatest setup right so after

27:09

the Cyber attack we move to a cloud application here's

27:14

the problem we went to the cloud it didn't sync up with the data

27:20

on campus so when you change your class or when you changed your meal plan or

27:26

when you uh decided to pick up a different class and needed different books from the bookstore it wasn't

27:31

synced up and so when you went there all you know is that it ain't working that's because we have a we had a data

27:38

issue we didn't even have permission to to mirror it anybody ever heard of active directory

27:44

yes good good okay though that that is where all of your data gets updated

27:50

right saved and updated there's one here there's one in the cloud inside of genzibar they now we now have permission

27:58

to sync those two things up Mr Paul can't raise your hand is our genzibar

28:03

expert that is what he does like 90 of his day that's huge it takes a lot it's

28:08

it usually it should take six months but we're probably what would you say is the percentage we are on that build out

28:16

build out probably 80 percent 80 percent 80 percent

28:24

anybody remember when I told you Aleutian got to campus what date they got to campus January 3rd when they got

28:30

to campus were 80 on something that had never even been built out right so most

28:36

of our problems will be fixed once our data on campus talks to our data in the

28:42

cloud everybody understand that that's where we are today so we are within shouting distance of fixing most of our

28:50

problems most of our problems are a data problem okay from a security standpoint

28:55

we've employed another company there'll be I won't say a whole lot about our cyber security because the Bad actors

29:01

may see this video all right so that's fine all right but we've locked the doors and we've locked the we locked the

29:08

windows and we are now obsessed with cyber security we are obsessed with

29:14

keeping you protected just like you see a campus security guard walking around strapped am I allowed to say that

29:22

absolutely right we we now are walking around your information your personal

29:28

information strapped that's the way that you can talk about it that's the way that you can say that's the way that we

29:34

represent you and we are not done we are we are in the process I'm going to announce it here I don't even know that

29:40

Dr Pollard knows this we are in the process of finalizing an mou with Cisco

29:45

for over a million dollars worth of grants for cyber security and networking

29:52

to boost our Wi-Fi

29:57

that's where we are today I appreciate the transparency that you

30:04

have given to the student assembly I believe that it is very important especially as you discuss the amount of

30:11

people who are aware of the issues that have taken place on the University's

30:16

campus and while people do like to hone in and you know lie in the

30:22

filth of what is mistakes what are wrongdoings what are accidents uh we

30:29

have hope in doing better and getting to a place where these issues do not exist

30:36

so can you just share with us a little bit about our technical logical future and where we are going absolutely all

30:44

right everybody knows that the biggest thing the biggest problem on campus for students is

30:51

say it again Wi-Fi okay it should not be I mean it's absolutely

30:59

embarrassing I say that some students have to go down to Starbucks in order to

31:05

connect to high-speed Wi-Fi so they can download their assignments to do their projects absolutely and it's

31:11

unacceptable it is like

31:16

I got better internet at home I'm not gonna lie right and

31:22

um if I didn't my 12 year old daughter and 14 year old son would let me know about it okay right so we know we know

31:28

about the problem why is there a problem with that because well I said at the end of the

31:35

last segment we got some old stuff really old right

31:40

um two it's not all talking to each other three some of the things like wireless

31:47

access points I keep using this number but now that we have the controller uh

31:53

Jared keep me honest on this I think we have 660 wireless access points on campus

31:58

95 okay I was way off okay

32:04

let's points on campus oh sorry my God 695 wireless access points on

32:12

campus um I would dare say I don't know yet because we haven't done the full

32:17

evaluation I would I if if I if I would if I had a guess I would say probably 30

32:24

of me ain't working and that creates dead zones but that's

32:29

not the only thing that creates dead zones Edwards Hall itself is a dead zone anybody here live in Edwards Hall

32:35

Edwards Hall thank you for my brother my my again

32:41

my God we even had a switch die on us in the last 30 days at Edwards Hall uh and

32:48

we had to go and triage that right so we feel for y'all we feel your pain we

32:54

understand Dean man is calling us incessantly and so here's what so if you think about that number 695 wireless

33:00

access points right what we have to do going forward is we have to evaluate what's working and what

33:07

isn't that's going to take a little bit of time they didn't do that in the past I know that you guys want it like right now and the the easiest thing is just

33:13

turn the bandwidth up well we already did that 10 times the amount of bandwidth prior

33:20

to the Cyber event is now piping into Oakwood but it ain't going anywhere because our

33:25

stuff is old and it's not connected okay so what we have is the illusion guys right specifically with Jared we

33:33







37:22

thank you so much Carl and you told us where we've come from where we are and where we are going so we're not going to

37:28

let you off the hook tonight though we're going to ask a couple of questions I think that's going to be important we've got our USM officers here

37:34

executive cabinet and our Senators and so tonight we're going to ask um for one of our USM officers citizens

37:40

to come to the mic because we have a couple of questions that we want to ask you now I want to keep remind you all we only have about 20 25 minutes left for

37:47

tonight and then we'll have a wrap up from our president but I'm going to ask someone who has a question tonight will

37:54

you please come to the mic introduce us give us your your first and last name and and what part of the branch of

38:00

government u.sm government you are representing hello my name

38:07

hello my name

38:19

hello my name is Sabrina Collins I am the Freshman Senator and my question is

38:26

why weren't the student ID cards working in various

38:32

um eating places such as the calf the um the market and the bistro excellent

38:39

question so there are a couple of everything's

38:44

database remember right and the applications that pair up

38:49

your meal plan once you financially cleared and selected your meal plan right that data travels into another application

38:56

Odyssey C board I'm just throwing out the names of the of these our partner Sodexo right

39:02

all looks into those applications and when you go to the the cafeteria and put it all of the all of that data has to

39:09

Jive the links to all of that were broken okay just before Chris they were broken

39:18

because well that's kind of Miss nowhere they were never there

39:23

it was people remember I told you people were entering the data so those people are gone your data wasn't being entered

39:30

even though you're financially cleared before you left even though you chose your meal plan before you left and all you really needed to do was come in and

39:35

run there there was there was nothing there was nothing there so it couldn't

39:40

associate Youth and we were just finding out about this because remember Lucian just got to campus I just got to campus

29

39:47

December 9th right and I was busy doing other stuff right so nobody really knew until the first student showed up and

39:52

was like Hey I financially cleared and my card does not work right so now we

39:59

run reports and we give them to Odyssey right we are automating that process so

40:05

that when something is changed in another part of the system it updates that in the meal plan system so that

40:13

everything is working and it gets approved appropriately when you come through with your with your card and is

40:20

matched up with your information again your data right so we had a very

40:25

significant um data collapse but in the process we found out it wasn't set up the right way

40:31

in the first place so thank you excellent question we'd like to invite the next

40:36

representative to ask their question

40:46

evening my name is Kyla Scott and I am the senator for the School of Business and my question is for the older

40:52

buildings such as Wade Hall Edwards hall or Moran is there anything being done to their Wi-Fi so that they can have some

40:59

service a little sooner excellent question so the question is is anything being done

41:06

one we've had to understand the timeline we have to find out what's in Edwards

41:12

Hall I know that sounds crazy but we're all new right and so we yes was it

41:17

yesterday Jerry we were walking around and somebody said yeah I think there's a switch in that closet we're like hey

41:24

drumming or send it to us like like even even in going to lunch or walking around here trying to do something else if like

41:30

if we're going all hands on deck if you know that if you know where the equipment is in that building please tell us because when The Old Company

41:36

left it's going to be transparent they didn't leave a map we're having to find like

41:42

hundreds and hundreds of pieces of equipment on our own right so















49:55

excellent question thank you we like to ask if anyone else has a question they'd like to ask

50:02

one of the things that many students have been challenged with uh which is a

50:07

subject that we will have another conversation about but particularly with the technology department as a student I

50:14

experienced this technological issue and that is submitting tickets

50:19

um last semester that did not get resolved and the registrar's office was clear in sharing that there were some

50:25

issues that took place which did not allow them access to that can you share with us a little bit about that yeah

50:32

absolutely and in fact we have an illusion expert here I don't want to

50:38

call you did you know too much but you can bounce it back to me if you're not 100 comfortable can we address what our

50:44

ticket wire tickets look like that specifically around the registrar and the microphones right behind you

50:50

this is Jared Wallace everybody he's better known as Superman

50:55

all right go ahead no so with the previous company they had a separate ticketing system

51:01

um when they left they took the keys with them as Carlin mentioned and we do not have any visibility to those tickets

51:08

anything that has been open in the past needs to be opened again so we can resolve it I know this is a pain point

51:15

because it is duplication of work but this is what we inherited and how we're

51:21

moving forward is if you get that open with the help desk so just emailing helpdesk oakwood.edu we'll get your

51:27

issues resolved absolutely thank you Jared to answer

51:32

your question it did thank you so much you know



so I'm so glad to know we've had this conversation I want to remind us this the truth about our

52:48

technological future and we definitely have some truths tonight right we were transparent but this is a part of a

52:54

series of conversations that we will have we we know that there's other things that we need to talk about and we're excited to talk about it we're not

53:00

running from it as our President says we're running towards it because we want to be transparent we want to be open we

53:06

want dialogue and it's important that we have these conversations so tonight I want to once

53:12

again thank Carlin I want to thank the Lucian team and I want to invite our president to come up who will wrap it up

53:17

for us and here share he'll share some words with us about um our next couple of steps thank you once again Dr Leslie Nelson Paula put

53:25

your hands together and while he's coming Caitlin thank you

53:31

just an excellent job I just appreciate working along with you as my co-moderator and I look forward to our

53:36

next time together well thank you thank you so very much Dr

53:42

Richardson and I want to take a moment to compliment Dr Richardson and Student Life admission for the the substantial

53:49

tremendous and incredible Relentless work that you do

53:56

every day to make sure that the life of our students is cared for if the students lose we all lose if the

54:04

students win we all win I want to end tonight simply for those who are watching I want to end tonight

54:10

in the interest of Black History Month with two Proverbs one of my hobbies is

54:15

collecting Proverbs especially from the continent of Africa there is a Nigerian writer by the name

54:22

of chinwa Achebe and he was writing one day about who gets to tell the history

54:28

of the great continent of Africa and this is what he said he said when the lion fails to tell the

54:36

story of the hunt the story will always glorify the Hunter

54:42

when the lion fails to tell the story of the hunt the story will always glorify the Hunter

54:50

tonight you have the opportunity to tell the story

54:55

where we were Where We Are and where we're going I hope that you

55:01

take advantage of the opportunity to share that story

55:07

and if you think that your voice is not big enough to make a difference then I have one more proverb from the continent

55:13

of Africa this is a Nigerian proverb it says if you think you're too small to

55:20

make a difference it's because you've never spent the night in a hotel room

55:25

with a mosquito foreign

55:31

you're never too small thank you for telling the story tonight let's give ourselves a big hand for this

55:37

conversation that we've enjoyed that in mind let's stand and we're going to have our closing prayer

55:46

now Lord you've heard where we've been you've overseen it you've blessed us

55:52

and where we are and we know that where we're going is into a more robust and

55:57

service-oriented future so bless us tonight and as we dismiss may we be

56:03

blessed in every way may we continue to tell the story knowing that none of us is too small

56:09

to make a difference we thank you we bless you and we praise you and thank you for this vital conversation tonight

56:16

in Christ's name let us say together amen amen thank you thank you thank you

56:22

USM General Assembly [Music]

56:32

[Applause]